[No. 6281.]

PEOPLE EX REL. JOHNSON v. EARL ET AL.

1. Elections—Registration in Cities—Statutory Construction.

The failure to appoint registration committees on the first day of July, 1906, as expressly required by chap. 100, Sess. Laws 1905, commonly known as the "registration law," does not affect the validity of appointments of registration committees, made after the amendment of such act (Sess. Laws 1907, c. 147) had taken effect, and in accordance therewith, since, by the express provisions of such amendment, the county clerk was authorized to appoint such committees immediately upon the act taking effect.—P. 247.

2. Same—Constitutional Law.

Registration laws enacted in compliance with § 11, art. 7, Colo. const., requiring the legislature to pass laws to secure the purity of elections, should be construed to effectuate the intent and purpose of such constitutional requirement.—P. 248.

3. Same—Public Officers — Election — Directory — Mandatory— Construction.

Statutes prescribing the manner, form, and time within which public officers are required to discharge public functions,

are regarded as directory, unless there is something in the statute showing a different intent; hence, statutes prescribing the power and duties of registration officers should not be so construed as to make the right to vote by registered voters dependent upon a strict observance by such officers of minute directions of the statute in the preparation of registration lists, and thus defeat the constitutional right of suffrage without the fault of the elector; for, if an exact compliance by the officers in matters of manner, form and time shall be held essential to the right of the elector to vote, elections would often fail and electors would be deprived, without their fault, of the opportunity to vote.—P. 248.

4.  **Statutory Construction—Mandatory Statutes—Directory Statutes.**

The requirements of a statute which are mandatory must be strictly construed, while the requirements which are directory should receive a liberal construction to the accomplishment of the intent and purpose of the law.—P. 249.

5.  **Elections—Registration—Statutory Construction.**

The requirements of the registration law which affect the results or merits of an election are mandatory, and the other provisions are directory only.—P. 249.

6.  **Same.**

Chapter 100, Sess. Laws 1905, as amended by Sess. Laws 1907, c. 147, provides that no person shall vote without first having been registered, requires the appointment of committees to prepare registration lists within a specified time, declares that the act shall be liberally construed, and that elections held thereunder shall be deemed regular. Held, that the provision requiring the appointment of a registration committee is mandatory, for no registration can be had without such committees; but the provisions with reference to the time within which the committees shall discharge their duties are directory, provided that qualified electors are not deprived of their constitutional right to vote, and the acts of the committees in no way affect the result of the election.—P. 249.

7.  **Elections—Registration—Committees and Officers—Duties—Failure to Perform—Mandamus.**

Certain duties are imposed upon the registration committees and other officers by the mandatory provisions of the registration laws (Sess. Laws 1905, c. 108, and Sess. Laws 1907, c. 147), and a failure to perform such duties will subject the delinquent to the penalties thereby imposed; and, upon proper showing, mandamus will lie to compel performance, but, in such case, it

will not lie until after the expiration of the time imposed by the acts within which the official is required to perform the duty. —P. 255.

8. **Cities and Towns—Nature—Legislative Control.**

Municipal corporations are created by law, partly as the agents of the state, but chiefly to administer the local affairs of the territory incorporated; and the legislature, in the absence of constitutional limitations, has plenary power to adopt for their government such measures as, in its judgment, best accomplish the purpose for which they are created, including the creation and manner of filling municipal offices, as provided by § 12, art. 14, Colo. const.—P. 257.

9. **Constitutional Law—Legislative Power—Cities and Towns.**

Section 13, art. 14, Colo. const., provides that the general assembly shall provide by general laws for the classification of cities and towns, and declares that the number of classes shall not exceed four, and the power of each class shall be defined by general laws, so that all municipal corporations of the same class shall possess the same power, and be subject to the same restrictions. Held, that such provisions prevent the legislature from granting special charters to cities and towns, and require it to provide for a classification thereof, and for a code of laws for the government of all such corporations of the same class— in other words, the power and restrictions are such as relate to subjects pertaining to local self-government as distinguished from such subjects as involve the relations of the citizens or the cities to the state.—P. 258.

10. **Same.**

Section 11, art. 7, Colo. const., commands the legislature "to pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Held, that laws enacted in response to the above mandate do not relate to subjects pertaining to local self-government or municipal affairs, and such laws are not within the contemplation of the constitution, § 13, art. 14, requiring the general assembly to provide, by general laws, for the organization and classification of cities.—P. 263.

11. **Same—Local or Special Laws—Elections—Registration.**

Subdivision 15, § 25, art. 5, Colo. const., prohibits the legislature from passing local or special laws for the opening or conducting of any election. Held, that the registration acts (Sess. Laws 1905, c. 100, and Sess. Laws 1907, c. 147) are not within such inhibition, since they do not attempt to control the opening or conducting, or designation, of the place of election.—P. 263.

**12. Constitutional Law—Local or Special Laws—Words and Phrases.**

A law is not local or special when it is general and uniform in its operation upon all in like situation.—P. 264.

**13. Evidence—Courts—Judicial Notice—Population of Cities.**

The supreme court will take judicial notice that there are many municipal corporations in Colorado having a greater population than 5,000.—P. 265.

**14. Constitutional Law—General and Special Laws—Elections—Registration Laws—Validity.**

Subdivision 24, § 25, art. 5, Colo. const., prohibits the general assembly from passing local or special laws where a general law can be made applicable. Held, that the registration acts (Sess. Laws 1905, c. 100, and Sess. Laws 1907, c. 147) providing for the registration of voters in cities of more than 5,000 inhabitants, are applicable to all cities in like situation, and is a reasonable classification, and therefore is not in conflict with such constitutional provisions.—P. 265.

**15. Constitutional Law—Elections—Registration Acts—Constitutionality.**

Section 1, art. 2, Colo. const., provides that political power is vested in and derived from the people; section 28 of the same article declares that enumeration in the constitution of certain rights shall not be construed to deny or impair others retained by the people; article 3 divides the power of government into three distinct departments; section 34, art. 5, forbids appropriations for charitable, etc., purposes to any person, corporation, etc., not under the absolute control of the state. Held, that the registration acts (Sess. Laws 1905, c. 100, and Sess. Laws 1907, c. 147) providing for the registration committees do not deprive the people of the right of local self-government, and the right to elect or appoint their local officers is not infringed, though the county clerk may not be a resident of the municipality, but a resident of the county, a separate municipality; nor are they in conflict with the above provisions of the constitution.—P. 265.

**16. Constitutional Law—Elections—Title — Sufficiency — Registration Law.**

The titles of the registration act of 1905 (Sess. Laws 1905, c. 100) and of the amendment thereto (Sess. Laws 1907, c. 147) are sufficiently broad to include the provisions for the appointment of registration committees and prescribing the time and manner of the performance of their duties in compliance with § 21, art. 5, Colo. const., providing that no bill shall contain more than one subject, which shall be expressed in its title.—P. 266.

16

*Appeal from the District Court of Boulder County.
Hon. James E. Garrigues, Judge.*

Information in the nature of *quo warranto* by
the people on the relation of Oscar A. Johnson, a
resident, citizen, elector and taxpayer of the city of
Boulder, against Isaac T. Earl, Oliver P. Clark,
Houston Jones, Guy A. Adams, Albert Lawrence,
A. E. Collins, A. S. McCoy, A. C. Van Deren, E. D.
Webb, H. W. Allen and Frederick White. From a
judgment of dismissal on sustaining demurrers to
the information, relator appeals.

Decision *en banc*.                    *Affirmed.*

Mr. OSCAR A. JOHNSON (Mr. C. A. PRENTICE, of
counsel), for appellant.

Mr. JOSEPH T. ATWOOD and Mr. CASSIUS M. EBY,
for appellees.

Mr. JUSTICE MAXWELL delivered the opinion of
the court:

Information in the nature of *quo warranto*.

This proceeding was brought by appellant, re-
lator, to test the right of respondents to the offices of
mayor, city clerk, city treasurer, and alderman of
the city of Boulder, which they were holding under
and by virtue of an election held April 2, 1907.

The questions presented are: (1) the regularity
of the acts of the registration committees preceding
the election; and, (2) the constitutionality of chapter
100, Session Laws 1905, page 188; and the amend-
ment thereof, chapter 147, Session Laws 1907, page
321, as applied to cities of the second class having
a greater population than 5,000 inhabitants.

The information was in two counts; a general
demurrer to each count was sustained.

Relator electing to stand on his complaint, judg-

ment of dismissal was rendered, from which is this appeal.

What is commonly known as the Booth registration law, Session Laws 1905, page 188, so far as pertinent to the questions here presented, provides for the appointment by the county clerk of each county, on the second Tuesday of July, 1906, and upon the same day every year thereafter, of a committee of three qualified electors in each precinct of the county, who shall act as a registration committee, and shall, between 45 and 35 days preceding an election, make a house-to-house canvass of the precinct, for the purpose of making a registration of the qualified electors of the precinct, and on the 30th day preceding the election shall sit at a centrally located place within the precinct for the purpose of making registration, and shall file with the county clerk three certified copies of the registration lists made by them and the books of original registration, at least 27 days preceding the election. Provision is also made for the purging of the registration lists of fraudulent registration, between 25 and 18 days preceding the election.

The title of the act and its express provisions limit its operation to cities or municipalities with a greater population than 5,000 inhabitants, and it expressly provides that no person shall be permitted to vote at any election (excepting the election of school trustees) held in any election precinct included wholly or partially within the limits of any city with a greater population than 5,000 inhabitants, without first having been registered within the time and in the manner and form required by the provisions of the act.

March 2, 1907, an act to amend sub-division 2 of section 3 of the act of 1905 was approved. The amendment is as follows:

"The registration committee shall consist of three qualified electors in each precinct, who shall be appointed by the county clerk for each of the precincts included wholly or partially within the limits of any city with a greater population than five thousand inhabitants, biennially as heretofore, on the first Tuesday in July, beginning with the year 1906, and he shall make and file in his office a list of each and all persons so appointed, their names, business, post-office and residence addresses, and the precinct and ward within which each lives; Provided, that in all such cities where the precinct lines for a city election are different from the precinct lines for a county election, the county clerk, at the same time and in the same manner, shall appoint additional or different registration committees for each of the precincts for such city election; Provided, further, that immediately upon the passage of this act, the county clerks of the different counties in this state within which are cities with a greater population than five thousand inhabitants, may appoint such registration committees for such city elections to be held in 1907, the names to select from being immediately certified to such county clerks by the county chairmen of the political parties as hereinafter defined and provided for in county elections.

"Sec. 2. All elections held under the provisions of this act, whether for the purposes of electing city officers or the issuance of bonds, shall be deemed to be regular and legal."

By virtue of an emergency clause this act took effect March 2, 1907.

The act of 1907 seems to have been made necessary by the failure of the boards of county commissioners of certain counties and the city councils of certain cities situate therein to conform the lines of election precincts in the cities to the lines of election

precincts outside the cities, prior to the first Tuesday of July, 1906, so that no registration committees were appointed by the county clerks on that day, under the act of 1905.

The county clerk of Boulder county, within which county is the city of Boulder, appointed registration committees for the precincts within the city, March 6, 1907, which committees proceeded to make registration lists of all the qualified electors within the city in strict conformity to all the requirements of the act of 1905, except as to the time within which they were by that act required to perform their several duties; commencing the house-to-house canvass and registration 27 days preceding the election, instead of 45 days, and returning to the county clerk the original registration books 15 days before the election.

The registration so made was used at the election held in the city of Boulder April 2, 1907, at which election respondents were elected to their several offices, from which this proceeding seeks to oust them.

The gist of relator's complaint embodied in his first count is thus stated:

"That said board of registration were not appointed by said county clerk within the time prescribed by law for the same to be appointed; that said registration board did not commence their duties within the times prescribed by law; that said registration board did not make the lists within the times prescribed by law; that said registration board did not return the original books of registration to the county clerk of Boulder county within the time prescribed by law, nor was any such registration of voters in said city, or in the separate wards thereof, made in compliance with the law; that by reason of such neglect and failures to follow said statute and to

make the registration as required by the law in that behalf made and provided, such pretended registrations were illegal and of no effect, and the pretended election held on the second day of April, 1907, in said city and in the separate wards thereof, was unlawful, null and void.''

The complaint further alleges, in substance, that by reason of the failure of the several registration committees to perform the various acts required of them within the time designated by the law of 1905, large numbers of the citizens and qualified electors of said city were deprived of the right of registration and the right to cast their votes at the election, naming three alleged electors who were so deprived of such right; that if such registration had been commenced 45 days before the election, the citizens named and other citizens and qualified electors could and would have registered, and could and would have voted at said election, and could and would have voted against the election of respondents herein.

The complaint does not allege that any qualified elector who applied for registration was denied registration, or that persons were registered and allowed to vote who were not qualified electors, or that the failure to make the registration within the time required by the law of 1905, resulted in a loss of the right to vote to a sufficient number of electors to have changed the result of the election or, that any qualified elector was deprived of the right to vote at the election, or that any fraud or corrupt practices were indulged in by the registration committees or the judges of election, which in any manner affected the result of the election, or defrauded relator of any of his constitutional rights.

Upon this branch of the case relator's contention is:

(A) That the registration committee were not appointed at the time designated by the law of 1905, to wit, on the first Tuesday of July, 1906, and therefore the appointment was invalid.

This contention is disposed of by the provisions of the act of 1907 authorizing the county clerk to appoint registration committees, in the municipalities therein designated, immediately upon the taking effect of the act.

(B) That all the acts of the registration committees in making the registration lists used at the election of April 2, 1907, were absolutely void, because none of such acts were performed within the time preceding the election required by the act of 1905.

In support of this contention it is most strenuously insisted, that all of the requirements of the act of 1905 are mandatory, and that failure to strictly comply with any of the requirements within the time limited by the act will result in the absolute disfranchisement of the voters.

Section 1 of the act, Session Laws 1905, page 188, is relied upon in support of this position. It reads:

"No person shall hereafter be permitted to vote at any general or special election, whether national, state, district, county or city (excepting election of school trustees) held in any election precinct included wholly or partially within the limits of any city with a greater population than five thousand inhabitants, without first having been registered within the time and in the manner and form required by the provisions of this act."

As no objection is urged to the manner or form of the registration in question, the discussion is limited to the one question of time, and we are urged to disfranchise the qualified registered voters of the en-

tire city, because the registration lists used at the
election held therein were not made within the time
limited by the law, and this through no fault of the
voters, and in the absence of any suggestion what-
ever to the effect that legal voters were deprived of
the right to vote, that persons not qualified were
allowed to vote, or, that illegal or corrupt practices
were indulged in by the registration committees
which in any manner affected the result of the elec-
tion; nor is it claimed that the failure of the registra-
tion committees to make the registration within the
time limited by the law of 1905 in any manner or to
any degree prevented a free and fair exercise of the
elective franchise, or cast any doubt or uncertainty
upon the result of the election.

The constitution of this state requires the legis-
lature ''to pass laws to secure the purity of elec-
tions,'' art. 7, sec. 11.

Registration laws have been enacted in compli-
ance with this requirement and should be construed
to effectuate the intent and purpose of the constitu-
tional requirement.

Statutes prescribing the manner, form and time
within which public officers are required to discharge
public functions are regarded as directory, unless
there is something in the statute which shows a dif-
ferent intent. Hence, as a general rule, statutes pre-
scribing the power and duties of registration officers
should not be so construed as to make the right to
vote by registered voters dependent upon a strict ob-
servance by such officers of all the minute directions
of the statute in the preparation of registration lists,
and thus defeat the constitutional right of suffrage,
without the fault of the elector, for if an exact com-
pliance by these officers in matters of manner, form
and time shall be held to be essential to the right of
the elector to vote, elections would often fail and elec-

tors would be deprived, without their fault, of the opportunity to vote.

We use the expression "registered voters" advisedly, as there is a vast difference between irregular registration and no registration at all, although relator grounds his whole case and argument upon the proposition that there was no registration at all.

The rule is well established that those requirements of a statute which are mandatory must be strictly construed, while those requirements which are directory should receive a liberal construction, to the accomplishment of the intent and purpose of the law. Those requirements are mandatory which affect the results or merits of the election. Others are directory.

Under the section of the law above quoted, no person can vote unless he is registered, and each elector must vote in the precinct where he is registered.

It is mandatory, therefore, to appoint registration committees, for no registration can be had without such committees, but the provisions of the law with reference to the time within which the committees shall discharge the duties imposed upon them by the law, are directory; provided qualified electors are not deprived of their constitutional right to vote, and the acts of the committees do not in any way affect the result of the election.

There is no declaration of the act under consideration which makes its provisions, with reference to the time within which the duties of the committees of registration shall be performed, mandatory. Section 9 of the act is:

"This act shall be liberally construed, so that all legally qualified electors may be registered, and that those who are not legal electors may be kept from such registration lists, and that fraud and corruption in elections may be prevented, and these pur-

poses shall not be defeated by any informality or failure to comply with the provisions of this act as to any notice required by this act.''

Here we have a clear statement of the rule to be adopted by the courts in the construction of all requirements of the statute which are not by their terms made expressly mandatory.

Section 2 of the act of 1907 is:

''All elections held under the provisions of this act, whether for the purpose of electing city officers or the issuance of bonds, shall be deemed to be regular and legal.''

This act did not become a law until March 2, 1907, fourteen days after the date when the committees were required, by section 10 of the act of 1905, to begin the house-to-house canvass for the registration of qualified electors.

The language of the section last quoted clearly indicates that the legislators had in mind the fact that city elections would be held within a short time of the date when the law went into effect, and it is fair to presume that this fact led to the enactment of section 2, clearly indicating that the legislature did not deem the provisions of the law of 1905 under consideration, mandatory. Otherwise the act of 1907 would have failed to accomplish the purpose for which it was enacted.

In *Stinson v. Sweeney,* 17 Nev. 309, it is said:

''In other respects where a non-compliance with the provisions of the registry or election laws, upon the part of the registry agent or officers of the election, are not essential 'to preserve the purity of elections,' the courts recognizing the fact that the will of the people, when fairly expressed, should be the law of the land, have universally declared that the qualified electors should not, on that account, be deprived of their votes.''

In other words, we believe that the provisions of the registry law should be strictly construed only when necessary to accomplish the purpose for which they were enacted, to wit, "to secure the purity of elections."

In the contested election of E. R. Wheelock, 82 Pa. St. 297, it is said:

"An election is the embodiment of the popular will, the expression of the sovereign power of the people. When the application of technical rules and a strict construction of the acts of the officers, in preparing the election papers and conducting an election, would tend to defeat the will of the people and change the result of an election for an important office, they should not be applied, and all reasonable intendments should be made in favor of the legality of their proceedings. * * * The state constitution, article 8, section 1, gives to every citizen possessing the qualifications prescribed, the right to vote, and section 7 of the same article provides that no elector shall be deprived of the privilege of voting by reason of his name not being registered. To disfranchise all the voters of a township, as we are asked to do in this petition, the facts on which we are required to act should show a case free from legal doubt. If we, by our decision, should permit the carelessness or even the fraud of officers whose duty it is to furnish a list of voters at the election, to defeat the election and deprive the people of the county of the officer who was elected by a majority of their votes, we would thus make the people suffer for an act in which they did not participate, and which they did not sanction. In so doing, instead of punishing an officer for the violation of the election law, we practically punish the voters of the county by defeating their choice of a county officer, as declared at the election. A decision of this kind would be fraught with danger, by

inviting unscrupulous or unprincipled persons, on the eve of an important election, to secrete or destroy the list of voters or other important papers in a township in which the majority may determine the result in the county."

In *Young v. Simpson,* 21 Colo. 460, 462, this court said:

"The principal object of the rules of procedure prescribed by statute for conducting an election is to protect the voter in his constitutional right to vote in secret; to prevent fraud in balloting and secure a fair count. Such rules are usually held to be directory as distinguished from mandatory, and unless the statute declares that a strict compliance is essential in order to have the ballot counted, the courts will not undertake to disfranchise any voter by rejecting his ballot, where his choice can be gathered from the ballot when viewed in the light of the circumstances surrounding the election." Citing cases.

In *Dickinson v. Freed,* 25 Colo. 302, the above was quoted with approval.

In *People v. Keeling,* 4 Colo. 129, this court held that holding a municipal election on the wrong day was not alone sufficient ground for granting a writ of *quo warranto.*

So it seems that this court is committed to the doctrine that all provisions of the election laws are not mandatory, and that the will of the electors, when fully and freely expressed, will not be defeated by a strict and technical construction of the law, and we believe that such doctrine should be applied in the construction of statutes relating to registration.

In *State v. Baker,* 38 Wis. 71, registry lists were used by the inspectors of election, which were defective in form and substance, and were not made by the registrars under color of compliance with the law, and the question was, whether the official nonfeasance

and malfeasance of the inspectors of election should operate to disfranchise legal voters without notice and without fault.  Chief Justice Ryan said:

"We say without notice and without fault; for none appears affirmatively in these cases.  And we cannot think that in such circumstances voters are chargeable with constructive notice of the failure of duty by the inspectors, or of the irregular or defective character of the registers *de facto* used by the inspectors at the election; or in default for not qualifying themselves as nonregistered voters, when they find themselves *de facto* registered on actual registers, used as official, regular and valid, by the inspectors, at the election.    *    *    *

"There were registers *de facto* of the voters, used by the inspectors at the election, as official and valid under the law.  The voters whose names were on them do not appear to have had any notice of irregularities or defects in them.  They appear to have come to the polls to vote, and to have voted in good faith, without any sort of warning that proof of their right to vote was required by law.   *   *   *   It would be a fraud on the constitution to hold them disfranchised without notice or fault.  They went to the election clothed with a constitutional right of which no statute could strip them, without some voluntary failure on their own part to furnish statutory proof of right.  And it would be monstrous in us to give such an effect to the registry law, against its own spirit and in violation of the letter and spirit of the constitution."

Judge Cooley says:

"The statutes of the different states point out specifically the mode in which elections shall be conducted; but, although there are great diversities of detail, the same general principles govern them all. As the execution of these statutes must very often

fall to the hands of men unacquainted with the law, and unschooled in business, it is inevitable that mistakes shall sometimes occur, and that very often the law will fail of strict compliance. Where an election is thus rendered irregular, whether the irregularity shall avoid it or not must depend generally upon the effect the failure to comply strictly with the law may have had in obstructing the complete expression of the popular will, or the production of satisfactory evidence thereof. Election statutes are to be tested like other statutes, but with a leaning to liberality in view of the great public purposes which they accomplish; and except where they specifically provide that a thing shall be done in the manner indicated, and not otherwise, their provisions designed merely for the information and guidance of the officers must be regarded as directory only, and the election will not be defeated by a failure to comply with them; providing the irregularity has not hindered any who were entitled from exercising the right of suffrage, or rendered doubtful the evidence from which the result was to be declared."—Cooley's Con. Lim. (7th ed.) 928.

Many authorities are cited by respondents which support the above announcement of the law by Judge Cooley.

Our attention has not been called to any authority which holds the contrary.

Many cases are cited by relator in support of his contention; all have been carefully examined, and all are easily distinguishable from the case at bar.

The following quotation is found in relator's brief taken from *In re Barber,* 10 Phila. 579:

"The election laws are mandatory, not directory. Where the terms of a statute are absolute, explicit and peremptory, no discretion is given, and when penalties are imposed against the violation of its re-

spective terms, they have the effect of negative words and render its observance imperative.''

From an examination of the case from which the above quotation is made, it appears that the court found that over 2,600 illegal and fraudulent votes had been cast in a total poll of about 16,000. Immediately preceding the quotation above given, we find this expression of the court:

''We say now, at the outset of our investigation, that unlike ordinary cases coming before the courts where the litigants allege *much* on the respective sides, but succeed in proving *little* comparatively, there has been exhibited here an array of testimony which, in the main, establishes the charges set up on one side and the other. It is, indeed, a sad commentary upon the integrity and intelligence of the persons who officially conducted this election that in *one hundred and eleven districts* the election laws of the commonwealth received but shameful observance. We have gone over the returns and accompanying papers in detail. The trail of heedlessness, incapacity and neglect covers them all. In some instances worse than this appears—the slimy finger of fraud and forgery has left its mark.''

The above is an extreme case, but in all the cases cited by relator it appears from the statement of facts or the opinion of the court, that the irregularities complained of, either defeated qualified electors of their constitutional right, permitted those unqualified to vote, or directly and positively affected the result of the election.

No such state of facts exists in the case at bar, so that many, if not all, of the authorities cited by relator are not in point.

Certain duties are imposed upon the registration committees, and other officers, by mandatory provisions of the acts under consideration. A failure to

perform such duties within the time, and in the manner provided by the acts, will subject the delinquent official to the penalties imposed by the law, and, upon proper showing, mandamus will lie against the offending official to compel performance of his duties; but in case mandamus is resorted to, it will not lie until after the expiration of the time limited by the law, within which the official is required to perform the duty.

If the construction contended for by relator is sound, the writ of mandamus would be fruitless.

To rule that the duties of the registration committees must be performed strictly within the time limited by the law, would place in corrupt officials the power to defeat the will of the people, without fault upon their part, and without hope of remedy or redress.

Such construction would defeat the intent and purpose of the law, and is contrary to all authority.

Our conclusion is that the first count of the information did not state facts sufficient to constitute a cause of action.

The second count of the information questions the constitutionality of the act of 1905 (Session Laws 1905, 188), and the amendment thereof (Session Laws 1907, 321), upon the following grounds:

I. That said acts are in conflict with section 13, article 14, of the constitution, which is:

"The general assembly shall provide by general laws for the organization and classification of cities and towns. The number of such classes shall not exceed four, and the power of each class shall be defined by general laws so that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions."

The general assembly, pursuant to this provision, classified cities and towns into cities of the first

and second class and incorporated towns; cities of the first class having a population of 15,000 inhabitants and upwards; cities of the second class having a population exceeding 2,000 and less than 15,000, and incorporated towns having less than 2,000 population.—(General Laws 1877, 905. Mills' Ann. Stats., §§ 4482, 4483.)

It is said that the acts under consideration being applicable only to "cities or municipalities with a greater population than 5,000 inhabitants" are obnoxious to the above section of the constitution, in that they provide a system of registration for all cities of the second class of over 5,000 inhabitants, different from the system of registration provided for cities of the same class of less than 5,000 inhabitants.

Municipal corporations are bodies corporate and politic, consisting of the inhabitants of a city, town or district, created by law, partly as the agent of the state to assist in the civil government of the state, but chiefly to administer the local affairs of the city, town or district which is incorporated; they are creatures of statute, endowed with such powers, duties, rights and privileges as are conferred upon them by statute, and none other, except such powers as arise by necessary or reasonable implication, to enable them to execute their functions; the legislature, in the absence of limiting constitutional provisions, has plenary power to adopt, for their government, such measures as shall, in its judgment, best accomplish the purpose for which they are created, including the creation and manner of filling municipal offices, either by election or appointment.—(Section 12, Article 14, Constitution.)

In *People v. Hall,* 8 Colo. 485, 497, it is said:

"Except as limited or controlled by constitutional provisions, the general assembly is omnipotent

in relation to municipal corporations within the state. It calls them into being and endows them with whatever powers and privileges they possess. · If in its judgment advisable, their existence, even, may at any time be absolutely terminated. In these and other particulars it bows only to the superior behests of the people expressed in their organic law. The object in creating these corporations is to better promote the interests of the people in localities than would be possible without.them, and the action of the general assembly in the premises must be understood as intended to advance the public good.''

See, also, *People v. Wright*, 6 Colo. 92, 96; *People v. Flemming*, 10 Colo. 553, 560; *In re Senate Bill*, 12 Colo. 188.

At the time of the adoption of the constitution of this state there were several cities and towns existing under special charters granted by the territorial legislature. The constitution recognized the existence of these special charters, and by section 14, article 14, provided for the enactment of a general law by the general assembly, whereby any city, town or village existing under special charter might elect to become subject to and be governed by the general law relating to such corporations.

The object to be attained by section 13, article 14, was to prevent the granting by the legislature of any special charters to cities and towns; to provide for a classification of all existing cities and towns, and to provide a uniform municipal code of laws for the government of all such corporations of the same class, or, in the language of the section: ''So that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.''

''The condemnation by the constitution of special charters is too plain to admit of controversy.

The framers of the instrument, and the people, having in view the many evils resulting from such special charters, absolutely prohibited the granting of such charters in the future, at the same time recognizing the injustice of annulling those already granted, allowed these to remain until repealed or voluntarily surrendered, but required the legislature to open the way by general law for the incorporation of cities and towns theretofore incorporated by special acts." —*In re Senate Bill* 293, 21 Colo. 38, 42.

In *Ward v. Contracting Co.,* 79 Fed. 390, Judge Phillips, in discussing a section of the constitution of Missouri, practically the same as the section here under consideration, said:

"This provision of the constitution is both mandatory and prohibitory. Its command is not only that the legislature shall provide for the organization and classification of all cities in the state, but such provision must be by general laws, not special enactments. It then commands the classification of such cities, and interdicts the creation of more than four classes. It further commands, not only that the legislature shall define the restrictions and powers of each of said classes, but also that this shall be done by general law. It then proceeds to declare the purpose of the convention in making this requirement to be, 'so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.' The clear intent of which is to prevent the multiplication of classes of municipalities, and the giving to one within the same class different powers or functions, and imposing upon any one restrictions different from those in the same class or division. In short, it is to secure absolute uniformity, by general law, applicable to all the given classes, respecting the faculties with which they might be endowed, and the limitations placed

upon their functions by the legislature; so that any person, anywhere, desiring to ascertain what are the powers and restrictions of any one city of a given class in the state, could be advised thereof by looking at the 'general law' defining such powers and restrictions.

"City charters were the favorite ground for special legislation. The constant tinkering to which those instruments were subjected, not only created confusion and uncertainty in construing the law, but covered the state with specimens of incongruous pieces of patch-work legislation, which gave widely varied rights to, and imposed dissimilar duties and obligations on, the citizens of different localities, without any substantial grounds for those variances.

"The object of the constitution of 1875, in dealing with this topic, was to secure some uniformity in the organization and action of municipal corporations in the state. Hence the strict limitations laid down in regard to the classification of cities, and the prohibition of more than four classes of city charters (even when created by general laws of incorporation) under the new constitution. Leaving, however, special charters granted previously to continue in operation.

"There was no design to isolate any of the cities from the great body of the people of the state, or to grant to any city special immunities or privileges. On the contrary, the idea was to place all those in like situation under like laws, civic duties and obligations."—*Kansas City v. Scarritt*, 127 Mo. 642, 652.

"The object to be attained by the seventh section of article nine of the constitution was well understood when the people adopted that instrument as the organic law of the state. In a word, it was to produce uniformity in the municipal charters of the

state, so that the city officials and citizens alike should know the law applicable to municipal corporations and their limitations, and to prevent a multiplication of charters, each different from the others, and also to relieve the legislature of a tribe of individual tinkerers who were constantly seeking changes in the charters of various cities and towns, too often for their own personal aggrandizement. Its design was that any citizen or any lawyer, whether in or out of the state, who desired to know the powers and restrictions of a given city, could ascertain them by reading the general law of the state governing such class."—*Owen v. Baer,* 154 Mo. 434, 439.

Section 7 of article 9 of the constitution of Missouri is substantially the same as the section of our constitution here under consideration.

The "powers" and "restrictions" contemplated by section 13, article 14, are manifestly such powers and restrictions as relate to subjects pertaining to local self-government, such as may be designated as strictly corporate municipal subjects, as distinguished from such subjects as involve the relations of the citizens or the cities and towns to the state.

This conclusion is strengthened by an examination of the law enacted by the first general assembly of the state, pursuant to the command of the section of the constitution here under consideration.

It discloses that all the powers conferred and the restrictions imposed upon cities and towns of all classes, relate to subjects purely local and municipal in their character.—Session Laws 1877, pages 874 to 919.

Judge Sanborn, writing the opinion of the court in *Contracting Co. v. Ward,* on appeal to the U. S. circuit court of the 8th circuit (85 Fed. 27, 33), in discussing the same section of the Missouri constitution, said:

"This section in no way limits the power of the general assembly to exercise by the passage of local option laws the police powers of the state in the prohibition or regulation of the liquor traffic, nor its power to legislate upon subjects which involve the relations of the citizens or the cities to the state, such as the drawing of juries and the collection of the revenues of the state, nor its power to pass enabling acts for the organization of towns and school districts."

The general assembly of 1885 enacted two laws relating to police courts, defining the powers and duties thereof and providing for the appointment of a police magistrate.—(Session Laws 1885, 285 and 290.) The first applied to all cities having a population of less than 25,000, which classification included all cities of the second class and a number of cities of the first class as defined by the law of 1877, while the second applied to all cities having a population of 25,000 or more inhabitants, including therein a portion only of the cities of the first class. And again, in 1895, the general assembly enacted a law creating a police magistrate court in all cities containing a population of 50,000 or more inhabitants, and in 1903 a law creating police courts in cities having a population of more than 25,000 and less than 50,000 inhabitants.—(Session Laws 1895, page 133; Session Laws 1903, page 377.)

All of the above enactments were in disregard of the classification of cities and towns made by the law of 1877, clearly indicating that the law-making power of the state does not regard the classification commanded by the section of the constitution and provided for by the law of 1877, applicable to subjects or matters other than those purely local and municipal.

The constitutionality of the laws last above re-

ferred to has been attacked in the courts of the state, but never upon the ground that such laws were violative of the section of the constitution here involved.

In *McInerney v. City of Denver,* 17 Colo. 302, the act of 1885, Session Laws 1885, was under consideration, and while section 13, article 14, of the constitution does not seem to have been involved, it is referred to in the opinion, and the act was sustained.

Section 11, article 7, of the constitution commands the legislature "to pass laws to secure the purity of elections, and guard against abuses of the elective franchise."

It needs no argument or citation of authorities to sustain the proposition, that laws enacted in response to the above mandate of the constitution, in no sense relate to subjects pertaining to local self-government or municipal affairs, and such laws, therefore, are not within the contemplation of section 13, article 14, of the constitution, and for this reason this contention of relator is untenable.

II. It is contended that the registration acts are in contravention of sub-divisions 15 and 24 of section 25, article 5, of the constitution:

"The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say:

"Fifteenth—The opening or conducting of any election, or designating the place of election.

"Twenty-fourth—In all other cases where a general law can be made applicable, no special law shall be enacted."

(a) The registration acts are not within the inhibition of the fifteenth sub-division above quoted, for the reason that they do not in any manner attempt to control the opening or conducting of elections, nor do they in any manner attempt to desig-

nate the place of election. The only provision of the acts with reference to elections is that making the registration committees judges of elections held during their term of office.

(b) It is said that the acts under consideration are special or class legislation; that a general act applicable to the whole state should have been enacted, and, therefore, these acts are within the inhibition of sub-division twenty-four, *supra;* and, further, that the acts being applicable only to municipal corporations of a greater population than 5,000, such classification is unreasonable and should not be sustained.

It is well settled that a law is not local or special when it is general and uniform in its operation upon all in like situation, so that it remains only to consider the question, whether or not the classification provided by the acts under consideration, is unreasonable.

Classification by population, while not directly involved in *Darrow v. People,* 8 Colo. 417, seems to have been recognized as not being inhibited by the section of the constitution under consideration, where it appears that such legislation was not an attempt to evade this provision of the constitution.

In *State v. Miller,* 100 Mo. 448 (referring to classification by population), it was said:

"To make such a law general there must be some distinguishing peculiarity which gives rise to a *necessity* for the law as to the designated class. A mere classification for the purpose of legislation without regard to such necessity, is simply special legislation of the most pernicious character, and is condemned by the constitution."

In *State v. Hammer,* 42 N. J. L. 440, in discussing the same question, it is said:

"There must be substantial distinction having

a reference to the subject-matter of the proposed legislation between the objects or places embraced in such legislation and the objects or places excluded. The marks of distinction on which the classification is founded must be such, in the nature of things, as will, in some reasonable degree, at least, account for or justify the restriction of the legislation."

See, also, *Murnane v. City of St. Louis*, 123 Mo. 479.

The rule announced by the above authorities is generally adopted by the courts.

We take judicial notice of the fact that there are many municipal corporations in this state having a greater population than 5,000.

The necessity for legislation of the character here under consideration must be conceded as being peculiarly applicable to cities and towns where large numbers of voters are congregated, to the end that the purity of elections may be secured, and abuses of the elective franchise guarded against.

The necessity for such legislation existing, the classification adopted is a matter to be determined by the legislature, and the courts will not run a race of opinions with the legislative branch of the government upon this question.

The position of relator upon this phase of the case cannot be sustained.

III. It is said that the acts under consideration are in conflict with the following provisions of the constitution.

(a) Section 1, article 2: "That all political power is vested in, and derived from, the people; that all government of right originates from the people, is founded upon their will only, and is instituted solely for the good of the whole."

(b) Section 28, article 2: "The enumeration in this constitution of certain rights shall not be con-

strued to deny, impair, or disparage others retained by the people.''

(c) Article 3, dividing the powers of the government into three distinct departments: legislative, executive and judicial.

(d) Section 34, article 5, forbidding appropriations for charitable, etc., purposes to any person, corporation, etc., not under the absolute control of the state.

The argument in support of the above contentions is based upon the general proposition that the registration acts deprive the people of the right of local self-government in that the appointment of registration committees, by the terms of the acts, is vested in the county clerk, and thus the right of the people to elect or appoint their local officers is infringed or may be infringed, as the county clerk may not be a resident of the municipality, although he must be a resident and elector of the county, a separate and distinct municipality.

Having determined that the acts under consideration do not relate to subjects pertaining to local self-government, it follows that they do not infringe any right of local self-government vested in the people, and this contention of relator is without merit.

IV. And finally, it is said that the subject of the acts is not clearly expressed in their titles, in violation of section 21, article 5, of the constitution.

The title of the act of 1905, page 188, is: ''An act concerning elections in all counties and municipalities within this state, whether created by direct constitutional provisions or pursuant to statutory enactment, and to provide for the appointment of a registration committee and judges of elections, and the registration of all qualified electors in election precincts included wholly or partially within the limits of cities or municipalities with a greater popula-

tion than 5,000 inhabitants, and to provide for punishing all violations thereof, and to repeal all acts and parts of acts inconsistent therewith.''

The title of the act of 1907, page 321, is: ''An act to amend subdivision two of section three of the act entitled 'An act concerning elections, etc.  *  *  * approved April 5, 1905.' ''

Our attention is not called to any provision of either act which is not germane to its title, and as the titles of the above acts are sufficiently general to include all the provisions of both acts, we dismiss this contention of relator with the statement that it is untenable.

A very large number of authorities have been cited, all of which have been examined, and we find none opposed to the conclusions here announced.

Our conclusion is that the court below properly sustained the demurrers to both counts and dismissed the action.    Its judgment is affirmed.    *Affirmed.*

Decision *en banc.*