## In re INTERROGATORY PROPOUNDED BY GOVERNOR ROY ROMER ON HOUSE BILL 91S–1005.

### No. 91SA225.

Supreme Court of Colorado,
En Banc.

July 11, 1991.

Barbara A. McDonnell, Chief Legal Advisor, Denver, for Governor Roy Romer.

Office of Legislative Legal Services, Douglas G. Brown, William A. Hobbs, Alice Boler Ackerman, Sharon L. Eubanks, Denver, for Colorado General Assembly.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Denver, for Atty. Gen.

Fairfield & Woods, P.C., Jac K. Sperling, Craig A. Umbaugh, Thomas M. Pierce, Denver, for Greater Denver Chamber of Commerce and Greater Denver Corp.

John K. Reynolds, Denver, for American Constitutional Law Foundation, Inc., The Colorado Union of Taxpayers, Inc., Senator Jim Roberts, Representative Charles Duke, and John Andrews.

Richard E. Young, Denver, for amicus curiae Richard E. Young.

Larry Carroll, Denver, for amicus curiae United Veterans Committee of Colorado.

William N. Baird, Fruita, interested party.

Justice ERICKSON delivered the Opinion of the Court.

The Governor of the State of Colorado has submitted an interrogatory to this court pursuant to Colorado Constitution, article VI, section 3, asking whether House Bill No. 91S–1005, in conjunction with House Bill No. 91S–1009, is constitutional under five specific provisions of the Colorado Constitution. We now hold and determine that House Bill No. 91S–1005, on its face, does not violate any of these five constitutional provisions.

I

The governor's interrogatory requested this court's opinion on the following questions:

Is House Bill No. 91S–1005 titled "Concerning Incentives to Establish a New Business Facility That Will Employ a Substantial Number of New Employees" in conjunction with House Bill 91S–1009 titled "Concerning the Allocation of Revenues Attributable to Taxes Imposed on Aviation Fuel to The Aviation Fund in Accordance With Section 18 of Article X of the Colorado Constitution, and in Connection Therewith, Providing for the Use of the Moneys in Such Fund and Making an Appropriation" constitutional under the following provisions of the Constitution of the State of Colorado:

A.

1. Article XI, Section 2, concerning aid to corporations.

2. Article V, Section 34, concerning appropriations to private institutions.

B. Article II, Section 11, concerning the irrevocable grant of special privileges.

C. Article V, Section 25, concerning special legislation.

D. Article XI, Section 3, concerning public debt of the state.

The interrogatory was submitted on June 12, 1991, and stated that House Bill No. 91S–1005 (H.B. 1005) and House Bill No. 91S–1009 (H.B. 1009) were enacted by the Colorado General Assembly and were delivered to the governor on June 10, 1991. The governor asserted that he had until July 10, 1991, to act on H.B. 1005 and to file it in the Office of the Secretary of State, and that if he did not file it by that date it would become law.[1]

Section 3 of article VI of the Colorado Constitution provides that "[t]he supreme court shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives...." We determined that the governor's questions were sufficiently important and proper and we agreed to exercise our original jurisdiction to answer the interrogatory. *See In re House Bill No. 1353*, 738 P.2d 371, 372 (Colo.1987); *In re Interrogatories by the Governor*, 116 Colo. 318, 319, 180 P.2d 1018, 1019 (1947). This court solicited briefs concerning the governor's interrogatory from all interested persons. The General Assembly, the governor, the Colorado attorney general, and the American Constitutional Law Foundation, Inc., among others, have filed briefs as amici curiae. Oral argument on the questions submitted by the governor was held in the Supreme Court Courtroom on June 26, 1991. We have considered the briefs and arguments of amici in answering the governor's interrogatory.

In H.B. 1005, the General Assembly established the "Colorado Business Incentive Fund" (CBIF), which consists of moneys transferred in accordance with the provisions of H.B. 1009. In addition, H.B. 1005 authorizes the state to enter into "intergovernmental agreements" with local governments or the Colorado Housing and Finance Authority (CHFA) for the purpose of providing incentives for "entities" to establish new business facilities employing a substantial number of new employees. The attorney general is to approve all intergovernmental agreements "as to form." Such intergovernmental agreements are to be funded from the CBIF and may never be funded from general fund moneys or

---

1. After agreeing to answer the governor's interrogatory, we are advised that the governor signed H.B. 1005 and H.B. 1009 into law on July 5, 1991.

other state moneys. The moneys in the CBIF are subject to annual appropriation by the General Assembly. Although the intergovernmental agreements are to be funded from the CBIF, H.B. 1005 does not state whether the funds appropriated by the General Assembly from the CBIF are to be paid to the local government or CHFA, or to some other entity. Nor does the bill define the term "incentive."

In entering into an intergovernmental agreement, the state is to consider a number of guidelines including the financial incentives provided by the local jurisdiction, the number of new jobs generated by the new business facility, the extent of employment of Colorado residents, and the extent to which the entity establishing the new business facility intends to contract with Colorado residents and companies for goods and services at the new facility. At a minimum, however, intergovernmental agreements relating to the establishment of a new business facility are subject to following requirements: (1) there must be an agreement between the local jurisdiction and the "entity which is to establish a new business facility" that the entity is to operate the new facility for at least thirty years; (2) the intergovernmental agreement shall provide that the entity employ at least 3,000 employees by July 1 of the tenth year following the effective date of the agreement between the local jurisdiction and the entity; (3) the agreement between the local jurisdiction and the entity shall require an average annual salary of at least $45,000 for employees at the new facility; (4) the intergovernmental agreement shall provide that the entity employ at least 2,000 employees at ancillary facilities in Colorado by July 1 of the tenth year following the effective date of the agreement between the local jurisdiction and the entity and that the ancillary employees' average annual salaries must be at least $22,500; and (5) the intergovernmental agreement shall provide that the agreement between the local jurisdiction and the entity contain certain sanctions, remedies, and procedures to enforce that agreement's terms, including, but not limited to, forfeiture of real and personal property rights.

*See* H.B. 1105, sec. 1, § 24–46.5–103(1) & (2). We refer to intergovernmental agreements authorized by section 24–46.5–103(1) & (2) as "subsection (1)" intergovernmental agreements.

Effective January 1, 1992, local governments are authorized to enter into intergovernmental agreements "in relation to the establishment of new business facilities which shall employ a *substantial* number of new employees receiving an average annual salary of no less than the average annual salary for such local government." H.B. 1005, sec. 1, § 24–46.5–103(3) (emphasis added) ("subsection (3)" intergovernmental agreements). Any entity that has received, or was eligible to receive, incentives pursuant to subsection (1) may not receive benefits under subsection (3). Subsection (1) intergovernmental agreements are funded from the CBIF by means of moneys transferred to the CBIF pursuant to H.B. 1009. The General Assembly, however, has identified no specific funding for subsection (3) intergovernmental agreements in either H.B. 1005 or H.B. 1009.

Finally, the total amount of incentives financed "for any person or entity under intergovernmental agreements under this article by the Colorado Business Incentive Fund shall not exceed one hundred fifteen million dollars." H.B. 1005, sec. 1, § 24–46.5–103(5).

An "aviation fund" is established in H.B. 1009, consisting of certain revenues derived from the state excise tax, sales tax, and use tax on aviation fuel. Section 43–10–110 of H.B. 1009 provides for monthly disbursements from the aviation fund to be made to the airport operating fund of the governmental entity operating the public-accessible airport from which the taxes are derived, except

if an intergovernmental agreement is entered into pursuant to the provisions of section 24–46.5–103(1), C.R.S., *the portion of the sales and use tax revenues that would otherwise be transferred to the governmental entity operating the largest airport in the state shall be transferred to the Colorado Business Incentive Fund created in section 24–*

*46.5–102, C.R.S.* If such an intergovernmental agreement is entered into, moneys shall be transferred by the state treasurer, beginning July 1, 1991, for the length of the intergovernmental agreement, and, following the conclusion of the agreement, or if no agreement is entered into, the moneys shall be transferred to such governmental entity in accordance with the provisions of this section.... Such moneys shall only be used for aviation purposes.

H.B. 1009, sec. 7, § 43–10–110((2). Colorado Constitution, article X, section 18, provides in pertinent part:

**License fees and excise taxes—use of.** On and after July 1, 1935, the proceeds from the imposition of any license, registration fee, or other charge with respect to the operation of any motor vehicle upon any public highway in this state and the proceeds from the imposition of any excise tax on gasoline or other liquid motor fuel *except aviation fuel used for aviation purposes* shall, except costs of administration, be used exclusively for the construction, maintenance, and supervision of the public highways of this state. *Any taxes imposed upon aviation fuel shall be used exclusively for aviation purposes.*

(Emphasis added.) "Aviation purposes" is defined in H.B. 1009, sec. 1, § 43–10–102(3) as

any objective that provides direct and indirect benefits to the state aviation system and includes, but is not limited to:
....
(f) the promotion of economic development which is related to the promotion, development, operation, or maintenance of the state aviation system....

" 'State Aviation System' means the network of facilities which includes airports, navigational aids, and safety-related facilities." H.B. 1009, sec. 1, § 43–10–102(8.5). Moneys not transferred to governmental entities operating public-accessible airports as provided in section 43–10–110(2), and not appropriated for administrative expenses, are to be used exclusively for aviation purposes, including the awarding of grants pursuant to section 43–10–108.5 of H.B. 1009. Such grants may be awarded to any entity operating a public-accessible airport and are to be used solely for aviation purposes. The City and County of Denver, however, is not eligible for section 43–10–108.5 grants.

## II

The amici have urged us to take judicial notice of certain facts pertaining to the reason the governor called the special session of the legislature, and the purpose and intent of the General Assembly in enacting H.B. 1005 and H.B. 1009. Under certain circumstances, this court may take judicial notice of adjudicative facts. CRE 201(b) provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." This is an original proceeding pursuant to section 3 of article VI. The absence of an appellate record requires us to take judicial notice of certain historical facts.

In a proceeding on interrogatories propounded by the governor with respect to the constitutionality of a bill passed by the General Assembly, this court may take judicial notice of matters of public record and common knowledge. *In re Senate Bill No. 95*, 146 Colo. 233, 238, 361 P.2d 350, 353 (1961). We may take judicial notice of the history of a statute when the history is a matter of public record in the office of the legislative reference service. *Industrial Comm'n v. Milka*, 159 Colo. 114, 119, 410 P.2d 181, 183–84 (1966). In addition, "[t]hat which is of common knowledge to an interested public can be judicially noticed." *Four–County Metro. Capital Improvement Dist. v. Board of Comm'rs*, 149 Colo. 284, 296, 369 P.2d 67, 73 (1962). Finally, in considering interrogatories propounded to the court by the senate, this court took judicial notice of the governor's proclamation convening the Extraordinary Session of the Legislature then in session.

*In re Opinion of the Justices,* 94 Colo. 215, 216, 29 P.2d 705, 705 (1934).

On May 30, 1991, the governor issued a "Proclamation Call for the First Extraordinary Session of the Fifty–Eighth General Assembly." The special session of the General Assembly was convened at 10:00 a.m. on June 4, 1991, and the governor designated the following subject for consideration and appropriate legislative action:

Concerning incentives for employers who establish or commence construction of a new business facility on or before July 1, 1994 in an enterprise zone in a Metropolitan Statistical Area that will employ at least 3,000 new employees at an average annual salary of at least $45,000 or in an enterprise zone in a non-Metropolitan Statistical Area that will employ at least 1,500 new employees at an average salary of at least $45,000, and the financing of such incentives.

Proclamation Call for the First Extraordinary Session of the Fifty–Eighth General Assembly. The governor's call stated that "in the opinion of the Governor, an extraordinary occasion has arisen because a unique economic development opportunity has been presented which requires immediate action...." *Id.*

Governor Romer addressed a Joint Session of the General Assembly on June 6, 1991, in the House Chamber. At this joint session, the governor stated that he had called the extraordinary session because a unique economic opportunity for the state had presented itself—the proposed construction of a maintenance facility in Colorado by United Airlines. Tape Recording of Governor's Message to Joint Session, First Extraordinary Session, June 4, 1991 (available at the offices of Legislative Council). The governor stressed that the "United deal" was a "unique" circumstance and opportunity for the state because of the number of new jobs involved in the United Airlines proposal and the average salaries of those jobs. He suggested that dedication of the aviation fuel tax in a specific fund could accomplish two things: (1) it could finance the United deal; and (2) it would take care of rural Colorado by

making funds available for economic development related to aviation beyond the paving of runways. *Id.*

■ In *Senate Bill No. 95,* we said:

Senate Bill No. 95 has had a stormy and very public legislative history. As judges we may not close our eyes to facts which as men we conclusively know to be true, which we would have to do if we pretended to be unaware of the fact that this legislation was known to every member of the legislature and to every other interested person as "The Glendale Bill." We would be blind to stark reality indeed if we assumed the possibility of any other geographical areas in Colorado to which it would apply, save and except the city of Denver and the town of Glendale.

*In re Senate Bill No. 95,* 146 Colo. at 238, 361 P.2d at 353. This court takes judicial notice that the primary purpose of the governor's call for the special session was to enable the General Assembly to consider legislation authorizing "incentives" to encourage United Airlines to construct and operate a new maintenance facility in Colorado.

■ We have also been asked to take judicial notice of the existence and terms of a proposed intergovernmental agreement between the state and Denver or CHFA, relating to a proposal by United Airlines to build a maintenance facility in Colorado. We decline to do this for two reasons. First, we believe that the existence and terms of a hypothetical intergovernmental agreement are not relevant to the specific questions presented by the governor's interrogatory, which is confined to the facial constitutionality of H.B. 1005 under five provisions of the state constitution. We would be exceeding the narrow scope of our original jurisdiction under Colorado Constitution article VI, section 3, if we were to offer an opinion on an intergovernmental agreement that is not contained in the governor's interrogatory, is apparently only proposed, and which may never be executed. *See In re House Resolution No. 12,* 88 Colo. 569, 570–71, 298 P. 960, 960 (1931); *In re Proposed Amendments to*

*the Constitution,* 50 Colo. 84, 114 P. 298 (1911).

Second, judicial notice would be inappropriate because the existence and contents of any such proposed intergovernmental agreement is neither "(1) generally known within the territorial jurisdiction of the trial court [n]or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." CRE 201(b). Accordingly, we confine our analysis of the provisions of H.B. 1005 and H.B. 1009 to the five constitutional questions contained in the governor's interrogatory.

### III

### A

#### 1. Article XI, Section 2

■ Colorado Constitution, article XI, section 2, provides, in pertinent part:

**Section 2. No aid to corporations— no joint ownership by state, county, city, town, or school district.** *Neither the state, nor any county, city,* town, township, or school district *shall make any donation or grant to, or in aid of,* or become a subscriber to, or shareholder in *any corporation or company* or a joint owner with any person, company, or corporation, public or private, in or out of the state, except as to such ownership as may accrue to the state ... or to any county, city, town, township, or school district, or to either or any of them, jointly with any person, company, or corporation, by forfeiture or sale of real estate for nonpayment of taxes, or by donation or devise for public use, or by purchase by or on behalf of any or either of them, jointly with any or either of them, under execution in cases of fines, penalties, or forfeiture of recognizance, breach of condition of official bond, or of bond to secure public moneys, or the performance of any contract in which they or any of them may be jointly or severally interested.

(Emphasis added.) At first this prohibition of aid to corporations, absent consideration, was strictly enforced. For example, in *The*

*Colorado Central R.R. v. Lea,* 5 Colo. 192 (1879), this court struck down a donation of 2,000 shares of stock belonging to Boulder County, to the Colorado Central Railroad Company. The court stated:

These and similar considerations of public benefit and advantage [the construction of a proposed line of railroad giving the county's citizens increased and superior facilities for traffic and commerce], had constituted for years, under our territorial government, the basis of appeals for and grants of county and municipal aid to railroad companies, and it was undoubtedly the intention of the framers of the Constitution, whether wisely or not, to prohibit, by the fundamental law of the new State, all public aid to railroad companies, whether by donation, grant or subscription, no matter what might be the public benefit and advantages flowing from the construction of such roads....

*If the existence of a public benefit is to give such an agreement the character of a sale of the stock, and take it out of the constitutional prohibition, then the prohibition is utterly nugatory and valueless, as such consideration would exist in every probable case.*

5 Colo. at 196 (emphasis added). Notwithstanding the apparent absolute prohibition of article XI, section 2, a "public purpose" exception has evolved. *See McNichols v. City & County of Denver,* 131 Colo. 246, 280 P.2d 1096 (1955) (upholding validity of ordinance establishing retirement program for city employees and distribution of the fund in event of termination of plan on the basis of the plan's "public purpose"). More recently, we said:

Our prior cases have held that article XI, section 2 of the Colorado Constitution does not prohibit a municipality from conferring a monetary benefit on a private company in consideration of the company's undertaking a project, even though the company might have been required to undertake the project without such benefit, *as long as the expenditure by a municipality furthers a valid public purpose.*

*City of Aurora v. Public Utils. Comm'n,* 785 P.2d 1280, 1289 (Colo.1990) (upholding PUC rule establishing certain methodology for calculating utility construction allowance applicable to service extension facilities for new electric utility customers). *See also Witcher v. Canon City,* 716 P.2d 445 (Colo.1986) (authorization of improvements to Royal Gorge Bridge served valid public purposes of improving and extending life of valuable source of municipal revenue); *Denver Urban Renewal Auth. v. Byrne,* 618 P.2d 1374, 1385 (Colo.1980) (strong public purpose served by urban renewal projects; fact that private interests are indirectly benefitted does not render plan unconstitutional under article XI, section 2); *Lyman v. Town of Bow Mar,* 188 Colo. 216, 533 P.2d 1129 (1975) (ordinance establishing improvement district for burying overhead utility lines owned by corporations, and providing for issuance of bonds to pay conversion costs was not prohibited "donation").

In answering the governor's interrogatory in this proceeding, it is unnecessary to further define the contours of either the consideration requirement or the public purpose doctrine. On its face, H.B. 1005 makes no "donation or grant to, or in aid of . . . any corporation or company. . . ." While the bill provides for appropriations by the General Assembly from the CBIF to fund subsection (1) intergovernmental agreements, H.B. 1005 does not require that any private corporation or company receive a grant or donation from the state. We have held that article XI, section 2, does not forbid grants from the state to political subdivisions of the state such as

CHFA; the provision only prohibits grants to private corporations. *In re Interrogatories Concerning House Bill No. 1247,* 193 Colo. 298, 307, 566 P.2d 350, 356 (1977).

■ A bill that has been enacted by the General Assembly is "presumed to be constitutional and cannot be declared unconstitutional unless that conclusion is established beyond a reasonable doubt." *In re House Bill No. 1353,* 738 P.2d at 372. This presumption of constitutionality is not overcome by speculation that state officials may at some future time act in an unconstitutional manner under color of H.B. 1005.[2] We conclude that H.B. 1005, on its face, does not violate article XI, section 2.

### 2. Article V, Section 34

■ Colorado Constitution, article V, section 34, provides in relevant part that "[n]o appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state. . . ." Like article XI, section 2, there is a "public purpose" exception to this provision. *See Americans United for Separation of Church & State Fund, Inc. v. State,* 648 P.2d 1072, 1085–86 (1982) (upholding Colorado Student Incentive Grant Program against article V, section 34, challenge).

■ A "public purpose" with respect to the Anti–Appropriation Clause is not to be presumed from the mere passage of a legislative enactment. *Americans United,* 648 P.2d at 1086. To come within the public purpose exception, "the legislation

2. We express no opinion, however, on whether the various proposals for the implementation of H.B. 1005 that have been suggested in the briefs of amici violate article XI, section 2. The actual execution of an intergovernmental agreement and the provisions of incentives must of course also comply with article XI, section 2. *Compare Allardice v. Adams County,* 173 Colo. 133, 476 P.2d 982 (1970) (upholding constitutionality of agreement in which a governmental entity agreed to issue bonds to acquire an agricultural plant and lease the plant to a private corporation that would pay rent sufficient to pay all bond obligations as they came due, plus maintenance and insurance costs and an amount equal to the taxes on the project, and the corporation

retained the option to purchase the project after the bonds were paid) *and Milheim v. Moffat Tunnel Dist.,* 72 Colo. 268, 211 P. 649 (1922) (holding constitutional the creation of an improvement district for the construction of a railroad tunnel that the district would own and control) *with Lord v. City & County of Denver,* 58 Colo. 1, 143 P. 284 (1914) (holding unconstitutional an agreement in which a railroad would control and charge rent for the use of a railroad tunnel during the life of bonds issued by a governmental entity to fund two-thirds of the cost of constructing the tunnel and the railroad would acquire title to the tunnel after paying the interest and principal of the bonds).

must evince a discrete and particularized public purpose which, when measured against the proscription of Article V, Section 34, preponderates over any individual interests incidentally served by the statutory program." *Id.*

In *In re Interrogatories Concerning House Bill No. 1247*, 193 Colo. 298, 566 P.2d 350, we upheld an act appropriating $150,000 to the Colorado Housing and Finance Authority for the purpose of increasing the supply of safe and sanitary housing for low and moderate income families against the claim that the act violated article V, section 34. In *Americans United*, 648 P.2d at 1086 n. 10, we noted that the constitutionality of the act in *H.B. 1247* did not turn on the "public or private status of the ultimate recipient of the appropriation." *See also Bedford v. White*, 106 Colo. 439, 106 P.2d 469 (1940) (statute authorizing payment of pensions to former Colorado Supreme Court justices did not offend article V, section 34, since it served a valid public purpose).

The public purposes specifically enunciated by the General Assembly in H.B. 1005 include increased employment and economic development in Colorado. In addition to these general public benefits, the General Assembly has also identified at least two "discrete and particularized public purpose[s]." *Americans United*, 648 P.2d at 1086. The first is the "development of new businesses and the expansion of existing businesses [resulting from] entities making a commitment to build and operate new business facilities which will result in substantial and long-term expansion of new employment within the state." H.B. 1005, sec. 1, § 24–46.5–101(1)(d). The second discrete purpose is to "provide[ ] direct and indirect benefits to the state aviation system...." H.B. 1009, sec. 1, § 43–10–101(3). We conclude that these public purposes are no less legitimate or particularized than the public purposes we have approved in prior cases. *E.g., Americans United*, 648 P.2d at 1085–86 (Student Incentive Grant program); *In re Interrogatories Concerning House Bill No. 1247*, 193 Colo. 298, 566 P.2d 350 (low and moderate income housing); *Bedford v. White*, 106

Colo. 439, 106 P.2d 469 (pensions to former supreme court justices).

The General Assembly has found that "the public purpose to be served by the passage of this article outweighs all other individual interests." H.B. 1005, sec. 1, § 24–46.5–101(e). "Although the expressed intent of the legislature has no magical quality which validates the invalid, it is entitled to reverent weight in determining whether the Act promotes a public purpose." *Allardice v. Adams County*, 173 Colo. 133, 147, 476 P.2d 982, 989 (1970). On this record, and within this original proceeding, we cannot say that the General Assembly's determination of a predominating public purpose is either in bad faith or erroneous. We conclude that, on its face, H.B. 1005 does not violate article V, section 34.

### B. Article II, Section 11

■ Article II, section 11, of the Colorado Constitution provides in pertinent part that "[n]o ... law ... making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly." Although the "irrevocable grant of special privileges, franchises or immunities" clause of article II, section 11, has been referred to in a number of cases, *e.g., Public Serv. Co. v. City of Loveland*, 79 Colo. 216, 245 P. 493, 497 (1926); *City of Leadville v. Leadville Sewer Co.*, 47 Colo. 118, 107 P. 801 (1909); *Virginia Canon Toll Rd. Co. v. People ex rel. Vivian*, 22 Colo. 429, 45 P. 398 (1896) (suggesting that the provision prohibits perpetual grants or franchises); *Thomas v. City of Grand Junction*, 13 Colo.App. 80, 56 P. 665 (1899), the precise meaning of the clause has not been discussed, and no alleged grant or franchise has been found to violate the clause.

In *City & County of Denver v. Denver Tramway Corp.*, 23 F.2d 287, 301–02 (8th Cir.1927), *cert. denied*, 278 U.S. 616, 49 S.Ct. 20, 73 L.Ed. 539 (1928), the federal circuit court of appeals examined the state cases and concluded that a city's grant without time limit of an easement to a public utility did not violate article II, sec-

tion 11, and that "[i]rrevocability and duration as applied to a grant under an ordinance ... have no connection with each other." *Id.* at 302. *See also Schafer v. Aspen Skiing Corp.*, 742 F.2d 580, 583–84 (10th Cir.1984) (apparently applying "reasonable grounds" test to uphold Colorado Ski Safety Act against article II, section 11, "irrevocable grant" claim).

 To come within the constitutional prohibition, the "irrevocable grant" must be contained in a "law." *Perl–Mack Enters. v. City & County of Denver*, 194 Colo. 4, 9, 568 P.2d 468, 472 (1977). There is no "irrevocable grant of special privileges, franchises or immunities" within the four corners of H.B. 1005, and we conclude that the bill does not, on its face, violate article II, section 11.

## C. Article V, Section 25

The governor next asks whether H.B. 1005, in conjunction with H.B. 1009, constitutes special legislation prohibited by article V, section 25. Article V, section 25, provides in part:

> The general assembly shall not pass local or special laws in any of the following enumerated cases ... granting to any corporation, association, or individual any special or exclusive privilege, immunity or franchise whatever. In all other cases, where a general law can be made applicable no special law shall be enacted.

While judicial notice may be taken of the fact that the impetus for this legislation was to structure incentives to cause United Airlines to locate its maintenance facility in Colorado, that fact by itself does not vitiate H.B. 1005 as special legislation. The question posed by article V, section 25, is whether the legislation creates true classes and, if so, whether the classifications are reasonable and rationally related to a legitimate public purpose.

 Soon after the state constitution was adopted, we said that the state's attempt to manage the Denver Public Schools was a *per se* violation of the Special Legislation Clause's enumerated prohibition against special legislation "providing for

the management of common schools." *In re Senate Bill No. 23*, 23 Colo. 499, 48 P. 647 (1897). Even when an enumerated prohibition is implicated, however, if there is a rational reason for distinguishing the class involved and the members of that class are treated alike, the legislation is not special. *City of Montrose v. Public Utils. Comm'n*, 732 P.2d 1181 (Colo.1987); *Vogts v. Guerrette*, 142 Colo. 527, 546, 351 P.2d 851, 862 (1960) (upholding automobile guest statute by holding that the statute applies to "all owners and operators of motor vehicles and their guests and none are excluded"). When an enumerated prohibition is implicated, the class cannot be limited to one. *In re Senate Bill No. 95*, 146 Colo. at 233, 361 P.2d at 350; *Darrow v. People ex rel. Norris*, 8 Colo. 417, 8 P. 661 (1885).

 If no enumerated prohibition is implicated, the question of whether a general law could be made applicable is within the discretion of the General Assembly, and will not be disturbed absent an abuse of that discretion. *Morgan County Junior College Dist. v. Jolly*, 168 Colo. 466, 452 P.2d 34, *appeal dismissed*, 396 U.S. 24, 90 S.Ct. 198, 24 L.Ed.2d 145 (1969); *Coulter v. Board of County Comm'rs*, 9 Colo. 258, 11 P. 199 (1886); *Carpenter v. People ex rel. Tilford*, 8 Colo. 116, 5 P. 828 (1885); *cf. City of Denver v. Bach*, 26 Colo. 530, 533, 58 P. 1089, 1091 (1899) (striking down Sunday closing laws that applied to certain businesses but not to others as lacking "any substantial reason"). That standard requires only that whatever classification is employed by the legislature be "reasonable." *People v. Sprengel*, 176 Colo. 277, 279, 490 P.2d 65, 67 (1971) (violation of fourteenth amendment amounts to special legislation); *People v. Maxwell*, 162 Colo. 495, 427 P.2d 310 (1967) (rational basis for distinguishing between developers with more than twenty sites from those with less than twenty sites).

Recently, we have applied the rational basis test to any challenge under article V, section 25, regardless of whether an enumerated prohibition was implicated or whether the challenge was simply that a general law could have applied. *Poudre*

*Valley Rural Elec. Assoc. v. City of Loveland,* 807 P.2d 547, 553 (Colo.1991) ("a statutory classification not involving a fundamental right or a suspect class [does] not violate article V, section 25, so long as it reasonably related to a legitimate state objective.... [A] statute is not special legislation if 'it is general and uniform in its operation upon all in [a] like situation.'" (quoting *City of Montrose v. Public Utils. Comm'n,* 732 P.2d at 1191)); *Bloomer v. Board of County Comm'rs,* 799 P.2d 942, 948 (Colo.1990) ("In analyzing constitutional challenges that are based on the special legislation clause, we have upheld legislation if a reasonable basis exists for the legislation's distinction between classes it has created.").

■ The prohibition against special legislation, however, is more than a redundant Equal Protection Clause. First, if an act is challenged as special legislation, and an enumerated prohibition is implicated, the threshold question is whether the classification adopted by the legislature is a real or potential class, or whether it is logically and factually limited to a class of one and thus illusory. *See In re Senate Bill No. 95,* 146 Colo. at 238–40, 361 P.2d at 353–54; *Darrow v. People ex rel. Norris,* 8 Colo. at 418–19, 8 P. at 662. If there is a genuine class, the next question is whether the classification is reasonable. *Bloomer,* 799 P.2d at 948 (upholding immunity granted to state political subdivisions); *Curtiss v. GSX Corp. of Colo.,* 774 P.2d 873, 876–77 (1989) (upholding Workers' Compensation Act against challenge that it granted a special immunity against tort liability); *Yarbro v. Hilton Hotels Corp.,* 655 P.2d 822, 827–28 (Colo.1982) (upholding statute of limitations against challenge that it granted certain classes of defendants special or exclusive privilege); *Vogts v. Guer-*

*rette,* 142 Colo. at 546, 351 P.2d at 862; *Young v. Board of County Comm'rs,* 102 Colo. 342, 345, 79 P.2d 654, 655 (1938); *see also Denver Urban Renewal Auth. v. Byrne,* 618 P.2d at 1385. If the classification is reasonable, the act is not barred by article V, section 25.

■ If the challenge is based on the final clause of article V, section 25, i.e., that a general law could be made applicable, the question is whether the General Assembly has acted arbitrarily or capriciously in its decision that a special law is required. *Morgan County Junior College Dist.,* 168 Colo. at 471, 452 P.2d at 36–37; *People v. Maxwell,* 162 Colo. at 501, 427 P.2d at 313; *Mosko v. Dunbar,* 135 Colo. 172, 179–80, 309 P.2d 581, 586 (1957); *People ex rel. Dunbar v. Schaefer,* 129 Colo. 215, 268 P.2d 420 (1954). If no enumerated prohibition is implicated, the size of the class becomes irrelevant so long as the legislature has not abused its discretion. *Morgan County Junior College Dist.,* 168 Colo. at 471, 452 P.2d at 36–37.[3]

■ Applying these standards, we conclude that H.B. 1005 is not, on its face, constitutionally prohibited special legislation. For purposes of analysis, we first assume that the enumerated prohibition in article V, section 25, against "granting to any corporation, association, or individual any special or exclusive privilege, immunity or franchise whatever," is implicated. Assuming, *arguendo,* that H.B. 1005 does grant a privilege or immunity, the legislation is not prohibited special legislation if there is a genuine class and if the classifications are reasonable. *Curtiss,* 774 P.2d at 876–77; *Yarbro,* 655 P.2d at 827–28.

In *In re Senate Bill No. 95,* we struck down the "Glendale Bill," which would have allowed Denver to annex Glendale

---

3. For example, in *Morgan County Junior College District,* we said:

"Time with its tides brings new conditions which must be cared for by new laws. Sometimes the new conditions affect the members of a class. If so, the correcting statute must apply to all alike. Sometimes the new conditions affect *one only or a few.* If so the correcting statute may be as narrow as the mischief.... The problem in last analysis is

one of legislative policy, with a wide margin of discretion conceded to lawmakers. Only in cases of plain abuse will there be revision by the courts." *Morgan County Junior College Dist.,* 168 Colo. at 471, 452 P.2d at 36–37 (quoting Justice Cardozo in *Williams v. Mayor & City Council of Baltimore,* 289 U.S. 36, 45, 53 S.Ct. 431, 434, 77 L.Ed. 1015 (1933) (emphasis added)).

involuntarily, because it was "unquestionably conceived, cut, tailored and amended to accomplish a particular purpose with reference to a particular area, to-wit, Glendale." 146 Colo. at 239, 361 P.2d at 354. The Glendale Bill was written and amended so that it only applied to Glendale, since there was no other city of less than 640 acres that was completely surrounded by a city or town. *Id.* Moreover, a repealing clause contained in the legislation provided for its automatic repeal the following year, so that there was no possibility "of any other geographical areas in Colorado to which it would apply." 146 Colo. at 238, 361 P.2d at 353.

On the other hand, in *Darrow*, we upheld an act creating a superior court in any town or city that contained more than 25,-000 people, even though that included only a class of one—Denver—when the act was adopted.

If this act were a clear and unequivocal attempt to evade the constitutional inhibition, and create a superior court for one particular city, we would unhesitatingly accede to the views of counsel. Such legislation, although the purpose be disguised by the use of general language, is not to be tolerated. But, construing all the provisions of the statute together, we cannot discover any such attempted evasion. Denver, it is true, is the only city to which the act at present applies. But the legislature clearly intended to provide for places that may hereafter acquire the population mentioned. The law is general, and is unlimited as to time in its operation. There is nothing unreasonable in the supposition that other towns and cities within the state will eventually contain 25,000 inhabitants.

8 Colo. at 418–19, 8 P. at 662. There are several classifications contained in H.B. 1005. The first, involving subsection (1) entities, is between aviation-related entities and all other entities. The second is between entities establishing new businesses in Colorado that will operate a facility for at least thirty years and employ at least 3,000 people paid an average of $45,000 per year, and all other businesses. There is also a classification between the establishment of new facilities and expansion of existing facilities. Finally, there is a distinction between subsection (1) and subsection (3) entities.

Although the class of subsection (1) companies is necessarily small by virtue of the limited resources of the state, we conclude that the class is not so logically and factually restricted that it amounts to an illusory class of one, such as the Glendale Bill provided. While the legislation specifies that any entity entering into an agreement with CHFA or the locality must remain in the state for at least thirty years, H.B. 1005 contains no other restrictions as to time. Here, unlike the Glendale Bill, there is no time limit, nor provisions in the bill that necessarily limit the benefits that may be obtained by United Airlines or any other single corporation. After thirty years, another aviation-related business, meeting the statutory criteria, may enter into an agreement for the same incentives, unlike the Glendale Bill repealing clause limiting the duration of the statute. Nor does the bill preclude more than one company entering into separate agreements at the same time, so long as the total outlay of incentives does not exceed 115 million dollars. Thus, we cannot say, as we did in *In re Senate Bill No. 95*, that no entity other than United Airlines will ever meet the statutory criteria set forth in H.B. 1005. There is nothing on the face of the legislation that limits subsection (1) entities to United Airlines. We conclude that H.B. 1005 is not, on its face, *per se* special legislation.

The next question is whether the classifications adopted by the General Assembly are reasonable. Because no suspect classifications are involved, we must uphold H.B. 1005 if we can conceive of any reasonable relation between legitimate stated purposes and the classifications made. *People v. Sprengel*, 176 Colo. at 280, 490 P.2d at 67. The classification must be based on some distinguishing peculiarity and must reasonably relate to the purpose of the statute. *People v. Maxwell*, 162 Colo. at 501, 427 P.2d at 313. Finally, members within the same class cannot be

treated differently. *City of Montrose v. Public Utils. Comm'n,* 732 P.2d at 1191; *Vogts v. Guerrette,* 142 Colo. at 546, 351 P.2d at 862.

In *Maxwell,* we said that distinctions based on size are permissible. 162 Colo. at 502, 427 P.2d at 313. Here, the distinction between subsection (1) entities and other businesses can be rationally related to the size difference. Although there may be little distinction between a company employing 3,000 workers and one employing 2,999, "[i]t is generally conceded that a classification having some reasonable basis does not offend against [c]onstitutional provisions [ ] merely because it is not made with mathematical nicety or because in practice it may result in some inequality." *Vogts,* 142 Colo. at 546, 351 P.2d at 861 (citations omitted). The incentives that could be generated pursuant to subsection (1) are of a great enough magnitude that the legislature could have reasonably concluded that the economic advantages that might be gained from a large employer locating in the state would outweigh the expense of the incentives, whereas smaller or existing corporations would not offer as great a benefit to Colorado. The distinction between aviation and nonaviation-related businesses is reasonable in the context of article X, section 18, of the Colorado Constitution, which mandates that taxes

imposed on aviation fuel be used exclusively for aviation purposes.

Finally, the classifications are reasonably related to the stated purpose of "continued encouragement, development, and expansion of opportunities for employment in the private sector in this state," H.B. 1005, sec. 1, § 24–46.5–101(a), and "any objective that provides direct and indirect benefits to the state aviation system," H.B. 1009, sec. 1, § 43–10–102(3). We conclude, therefore, that H.B. 1005, in conjunction with H.B. 1009, does not, on its face, violate article V, section 25.[4]

### D. Article XI, Section 3

The final constitutional provision we examine is Colorado Constitution article XI, section 3, which provides, in part:

> **Section 3. Public debt of state—limitations.** The state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue, erect public buildings for the use of the state, suppress insurrection, defend the state, or, in time of war, assist in defending the United States....

In *In re Interrogatories Concerning House Bill No. 1247,* 193 Colo. at 305, 566 P.2d at 355, we held that a bill providing appropriations to secure obligations issued by the Colorado Housing Finance Authority did not violate the constitutional prohibition against contracting debt by loan. The

---

4. The isolated comments of individual legislators in committee do not change our conclusion that H.B. 1005 is not unconstitutional special legislation on its face. The statement of the Chair of the Senate Finance Committee that the bill had been drafted to "meet[ ] constitutional muster," while at the same time to "take advantage of United Airlines and their effort to come here," does nothing more than indicate the General Assembly's efforts to enact a constitutional bill. Further, *in terrorem* comments made by the *opponents* of a bill are of dubious and limited value in the judicial interpretation and construction of the bill. *See Shell Oil Co. v. Iowa Dep't of Revenue,* 488 U.S. 19, 29, 109 S.Ct. 278, 283–284, 102 L.Ed.2d 186 (1988) ("This Court does not usually accord much weight to the statements of a bill's opponents. ' "[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation." ' *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 483, 101 S.Ct. 2870, 2878, 69 L.Ed.2d 784 (1981) (quoting *Schwegmann Bros. v. Calvert*

*Distillers Corp.,* 341 U.S. 384, 394, 71 S.Ct. 745, 750, 95 L.Ed. 1035 (1951)).").

Justice Quinn, in his dissent, goes beyond a facial analysis of H.B. 1005 for evidence that the bill is limited to United Airlines. This misperceives our analysis of article V, section 25. Only after we have concluded that the class of beneficiaries created in H.B. 1005 is not necessarily limited to United Airlines, do we examine the reasonableness of the classifications. All legislative classifications are to a greater or lesser extent "artificial." The relevant inquiry, however, is whether the classifications are rational. The requirement that a subsection (1) entity be aviation related is derived from article X, section 18's, limitation on the use of aviation fuel taxes, which are the source of subsection (1) funding. The second major classification—size—is a legislative determination that incentives such as these are not to be extended except in extraordinary circumstances when the potential economic benefits to the state are great.

purpose of the constitutional provision is to prevent the pledging of state revenues of *future* years. *Id.* Because the appropriations bill did not "create an obligation 'that requires revenue from a tax otherwise available for general purposes to meet it,'" it was not a "debt" within the meaning of section 3 of article XI. *Id.* (quoting *Johnson v. McDonald*, 97 Colo. 324, 340–41, 49 P.2d 1017, 1025 (1935)).

In *Johnson v. McDonald*, we upheld two statutes that authorized the state to enter into a contract with the federal government for the United States to advance Colorado $25 million in funds for the construction, supervision, and maintenance of public highways in the state. Revenue anticipation warrants were to be issued to the federal government and paid from a highway anticipation fund. The highway anticipation fund was a sinking fund created by the highway department for the payment of the anticipation warrants and interest out of the highway fund. The highway fund consisted of excise taxes derived from the imposition of license, registration fees, and other charges with respect to the operation of motor vehicles upon the state highways, and the imposition of any excise tax on gasoline or other liquid motor fuel. *Id.* at 335, 49 P.2d at 1023.

These statutes did not constitute constitutional debt. "The payment of the anticipation warrants out of the fund provided by the act can never place any burden on the revenues available for appropriation for general state purposes." *Id.* at 341, 49 P.2d at 1025. *See also Watrous v. Golden Chamber of Commerce*, 121 Colo. 521, 218 P.2d 498 (1950) (bonds authorized for turnpike construction did not constitute constitutional indebtedness because they were to be repaid from: (1) fares and tolls from turnpike project; and (2) state highway fund consisting of proceeds from motor vehicle license fees and motor fuel taxes that were not general revenue subject to legislative appropriation because of article X, section 18).

■ An appropriation by the General Assembly is not a payment on a constitutional debt if it is "purely discretionary and nonobligatory...." *In re Interrogatories Concerning House Bill No. 1247*, 193 Colo. at 305, 566 P.2d at 355. Financing devices that have been upheld by this court in other cases are: (1) special fund cases such as *Johnson v. McDonald* in which the borrowed funds are repaid from the revenue generated by the improvement; (2) cases in which the entity borrowing the money is a public entity independent of the state; and (3) cases in which the state enters into lease/purchase agreements for a building or other improvement and in which the parties are not bound to renew the lease at the end of each year. *Colorado Ass'n of Public Employees v. Board of Regents*, 804 P.2d 138, 147 (Colo.1990). *But see In re Senate Resolution No. 2*, 94 Colo. 101, 31 P.2d 325 (1933) (bill to borrow money to relieve unemployment by providing work on highways and providing that taxes already imposed should be used for repayment contracted "debt by loan" prohibited by article XI, section 3).

We conclude that H.B. 1005 does not, on its face, violate the constitutional prohibition against state debt. It contains no provisions either pledging future state revenues or imposing obligations that would require future revenues from a tax otherwise available for general purposes.

### IV

Accordingly, with our review limited to the wording of H.B. 1005 and H.B. 1009, and the interrogatory propounded by the governor, we conclude that H.B. 1005, on its face, in conjunction with H.B. 1009, does not violate the sections of the Colorado Constitution that were the subject of the interrogatory.

KIRSHBAUM, J., concurs in part, specially concurs in part, and dissents in part.

QUINN, J., dissents, and ROVIRA, C.J., joins in the dissent.

Justice KIRSHBAUM concurring in part, specially concurring in part, and dissenting in part.

I concur in the majority's conclusion that H.B. 91S–1005, in conjunction with S.B.

91S–1009 (hereinafter H.B. 1005), does not facially violate article II, section 11; article V, section 25; or article XI, section 3 of the Colorado Constitution. I specially concur in Part III(A)(1) of the majority opinion to the extent it concludes that on its face H.B. 1005 does not authorize a grant or a donation. However, because I disagree with the majority's analysis of the public purpose doctrine expressed in Parts III(A)(1) and (2) of its opinion, and because I conclude that H.B. 1005 on its face violates prohibitions on the exercise of legislative power established by article V, section 34, of the Colorado Constitution, I respectfully dissent to Part III(A)(2) of the majority opinion.

### I

Article V, section 34, of the Colorado Constitution states as follows:

> **Appropriations to private institutions forbidden.** No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state, nor to any denominational or sectarian institution or association.

House Bill 1005 appropriates funds for the benefit of industrial corporations not under the absolute control of the state. While the initial recipient of the appropriation is a special fund, that entity is a mere conduit. The fund must ultimately pay all appropriated sums to one or more qualifying corporations. Thus H.B. 1005 on its face violates the express language of article V, section 34.

Apparently conceding this structural analysis of the bill, the majority holds that the public purpose doctrine articulated by this court constitutes an exception to the prophylactic provisions of article V, section 34, and that the doctrine applies to this bill. Op. at 883–884. I conclude that the laudable and quite beneficial legislative desire to create many well-paying jobs in Colorado does not satisfy the public purpose exception to the prohibitions of article V, section 34.

Our constitution was crafted by delegates to a constitutional convention who exercised the authority and therefore the will of the citizens of the Territory of Colorado. As emphasized by article II, section 2, the Constitution represents grants of authority from the governed to the three departments of government.[1] *See Hudson v. Annear*, 101 Colo. 551, 75 P.2d 587 (1938). The plenary authority of the legislative department is limited initially by the terms of that article V, section 1.

Article V, section 1, of the Colorado Constitution establishes the scope of the plenary power of the General Assembly as follows: "The legislative power of the state shall be vested in the general assembly. . . ." Colo. Const., art. V, § 1. The principle that the only power exercisable by the General Assembly is the "legislative power" vested in the legislative department by the Constitution is reinforced by the provisions of article V, section 1, reserving to the People the power of initiative and referendum. *Colorado Project–Common Cause v. Anderson*, 178 Colo. 1, 495 P.2d 220 (1972); *In re Legislative Reapportionment*, 150 Colo. 380, 374 P.2d 66 (1962); *Burks v. City of Lafayette*, 142 Colo. 61, 349 P.2d 692 (1960); *Baker v. Bosworth*, 122 Colo. 356, 222 P.2d 416 (1950); *Brownlow v. Wunsch*, 103 Colo. 120, 83 P.2d 775 (1938).

The plenary legislative power vested in the General Assembly is quite broad in scope. *In re Interrogatories*, 97 Colo. 587, 52 P.2d 663 (1935); *In re Senate Resolution No. 4*, 54 Colo. 262, 130 P. 333 (1913). There are, however, limits to this grant of plenary power. *Olin Mathieson Chem. Corp. v. Francis*, 134 Colo. 160, 301 P.2d 139 (1956). Some such limits are inferable from the concept of separation of powers expressly embodied in article III of Colorado's Constitution. *See, e.g., Colorado Gen-*

---

**1.** The section states in pertinent part as follows: *Section 2. People may alter or abolish form of government—proviso.* The People of this state have the sole and exclusive right of gov-erning themselves, as a free, sovereign and independent state. . . .
Colo. Const., art. II, § 2.

*eral Assembly v. Lamm,* 700 P.2d 508 (Colo.1985); *In re Interrogatories Propounded by Senate Concerning House Bill 1078,* 189 Colo. 1, 536 P.2d 308 (1975); *People v. Davis,* 186 Colo. 186, 526 P.2d 312 (1974); *Colorado State Bd. of Medical Examiners v. District Court,* 138 Colo. 227, 331 P.2d 502 (1958); *Kolkman v. People,* 89 Colo. 8, 300 P. 575 (1931). This doctrine requires delineation and therefore definition of the distinct powers allocated to the separate departments of government. *Colorado State Bd. of Medical Examiners,* 138 Colo. at 232, 331 P.2d at 505; *Smith v. Miller,* 153 Colo. 35, 40, 384 P.2d 738, 741 (1963); *City and County of Denver v. Lynch,* 92 Colo. 102, 106, 18 P.2d 907, 909 (1932).

The *sine qua non* for the exercise of government authority, whether that authority be legislative, executive or judicial, is that the authority be exercised in furtherance of public purposes. The general purpose to be served by the exercise of plenary legislative power has been characterized as the health, safety, morals and welfare of the general public. *See, e.g., City and County of Denver v. Denver Buick, Inc.,* 141 Colo. 121, 127, 347 P.2d 919, 924 (1959), *overruled on another issue, Service Oil v. Rhodus,* 179 Colo. 335, 347, 500 P.2d 807, 813 (1972); *Eachus v. People,* 124 Colo. 454, 458–59, 238 P.2d 885, 888 (1951). Assuming that a particular statute furthers a public purpose and is therefore the product of what appears to be a valid exercise of article V, section 1, legislative power, a separate constitutional provision that in effect nullifies such legislative conduct may be viewed as a modification of the very definition of "legislative power" or as a constitutional caveat that legislative power may not be exercised in certain circumstances. While these two perspectives might command different results in various contexts, they may be collapsed for purposes of this analysis. Con-

stitutional limitations on the exercise of plenary legislative power in effect prohibit the General Assembly from furthering the broad public purposes for which the challenged legislation was necessarily designed, however important or beneficial such purposes might be.

## II

The legislative purpose articulated by H.B. 1005 is the purpose to create numerous well-paying jobs for Coloradoans, thereby enhancing the economic climate of the state. While the opponents of H.B. 1005 have voiced disagreement with the wisdom of such legislation, no one has suggested such purpose is not a public purpose justifying the exercise of plenary legislative power under article V, section 1, of the Constitution.

It also appears to be undisputed that one effect of H.B. 1005 will be to provide a benefit to one or, arguably, several private industrial corporations. The plain language of article V, section 34, prohibits the exercise of article V, section 1, plenary legislative power to appropriate state funds for industrial purposes to a private corporation.

Supporters of H.B. 1005 assert that such literal construction of the language of article V, section 34, has long been disavowed by this court in a series of opinions establishing a "public purpose" exception that has substantially narrowed the scope of that constitutional provision. The attorney general submitted a brief that in essence agrees with that argument but suggests that the public purpose doctrine is in need of fine tuning. My review of our past decisions compels the conclusion that the public purpose doctrine is not applicable in the circumstances of this case and that, therefore, article V, section 34, renders H.B. 1005 unconstitutional on its face.[2]

---

**2.** The doctrine has also been applied in several cases wherein legislation has been challenged as violative of article XI, section 2, of the Colorado Constitution. *See, e.g., McNichols v. City and County of Denver,* 131 Colo. 246, 280 P.2d 1096 (1955) (citing *Bedford v. White,* 106 Colo. 439, 106 P.2d 469 (1940), for the principle that this

court had adopted a liberal policy toward pension legislation); *Allardice v. Adams County,* 173 Colo. 133, 476 P.2d 982 (1970) (statute authorizing counties to issue revenue bonds and lease agreement permitting county to sell agricultural feed plant to private developer not a donation); *Witcher v. Canon City,* 716 P.2d 445

This court first explored the history and scope of article V, section 34, in *In re Relief Bills*, 21 Colo. 62, 39 P. 1089 (1895), and *In re Constitutionality of Substitute for Senate Bill No. 83* (*In re Benedictine Sisters Bill*), 21 Colo. 69, 39 P. 1088 (1895).[3] In *In re Relief Bills*, the Governor submitted an interrogatory to the court requesting an opinion as to whether a bill adopted by the General Assembly and submitted to the Governor for executive action was prohibited by article V, section 34. The bill appropriated the sum of $32,250 from the state treasury for disbursement by county commissioners of specified counties to farmers reduced to "destitution and want" by drought-induced crop failure. *In re Relief Bills*, 21 Colo. at 64–65, 39 P. at 1089–90. Noting that few state constitutions contained language similar to article V, section 34, we reviewed the history of the adoption of this provision as revealed by the proceedings of our constitutional convention and concluded that the proposed legislation was prohibited by article V, section 34, and therefore was not within the plenary power of the General Assembly. In so doing, we stated as follows:

> We have not reached this conclusion without much reluctance. The condition of the people sought to be benefited by this act appeals to all to overlook the rules and principles established by our state constitution, but the question presented must be determined by the court without reference to the hardships the conclusion may work in individual cases.

*In re Relief Bills*, 21 Colo. at 69, 39 P. at 1091.

In *In re Benedictine Sisters Bill*, 21 Colo. 69, 39 P. 1088 (1895), this court rejected a challenge based on article V, section 34, to a bill adopted by the General Assembly appropriating funds to permit the state board of penitentiary commissioners to compensate a religious order for any damages caused by a state construction project. Observing that the institution allegedly benefited by the legislation was entitled to just compensation for any of its property taken by the state under other constitutional provisions, we held that the specific purpose of the legislation was to further a constitutionally required legislative responsibility. In *In re Relief Bills* we found no distinct public purpose for the legislation. In *In re Benedictine Sisters Bill* we found a distinct constitutionally required purpose for the legislation, that being just compensation for the taking of private property.

*Colorado Central R.R. Co. v. Lea*, 5 Colo. 192 (1879), is another early and relevant decision. In *Lea*, this court reviewed a trial court judgment enjoining the Board of County Commissioners and a railroad company from carrying out a transaction which in substance involved the donation of shares of the railroad company's stock owned by the county to the railroad company. We held that the transaction was barred by article XI, section 2, of the Colorado Constitution.[4] Although the case did

(Colo.1986) (amendment to lease governing private company's operation of bridge and park not a donation); *Denver Urban Renewal Authority v. Byrne*, 618 P.2d 1374 (Colo.1980) (proposed bond issuance by city urban renewal authority not a grant or donation in aid of individuals or corporations); *City of Aurora v. Public Utils. Comm'n*, 785 P.2d 1280 (Colo.1990) (Public Utilities Commission rule adopted for calculation of construction allowance not a donation and supported by public purpose doctrine).

**3.** We first addressed the language of art. V, sec. 34, in *The People ex rel. Richardson v. Spruance*, 8 Colo. 530, 9 P. 628 (1885), wherein we sustained a demurrer by the state auditor to a petition by the Colorado State Horticultural Society seeking a judicial order requiring the auditor to pay certain sums to the Society pursuant to a statute. We held that the statute in question failed to appropriate any funds for payment to the Society. We also observed that were payments to be made, they would not violate art. V, sec. 34, of the Colorado Constitution because the Society was in fact under the control of the state.

**4.** The provision states in pertinent part as follows:

> **Section 2. No aid to corporations—no joint ownership by state, county, city, town, or school district.** Neither the state, nor any county, city, town, township, or school district shall make any donation or grant to, or in aid of ... any corporation or company ... except as to such ownership as may accrue to the state by escheat, or by forfeiture, by operation or provision of law....

Colo. Const. art. XI, § 2.

not require construction of article V, section 34, the following language from that opinion is generally instructive with regard to the effect of constitutional provisions curtailing the General Assembly's exercise of its plenary legislative power:

> That the construction of the proposed line of railroad would be of great benefit to the county and its citizens; that it would give them increased and superior facilities for traffic and commerce with both the Atlantic and Pacific seaboards, do not make it any the less a donation within the intent of the inhibition.

> These and similar considerations of public benefit and advantage, had constituted for years, under our territorial government, the basis of appeals for and grants of county and municipal aid to railroad companies, and it was undoubtedly the intention of the framers of the Constitution, whether wisely or not, to prohibit, by the fundamental law of the new State, all public aid to railroad companies, whether by donation, grant or subscription, no matter what might be the public benefit and advantages flowing from the construction of such roads. I understand the framers of the Constitution and the people who adopted it, to have intended by this provision the declaration of a broad policy of prohibition, forbidding State, county and municipal aid to railroad and other companies in any of the modes specified.

> If the existence of a public benefit is to give such an agreement the character of a sale of the stock, and take it out of the constitutional prohibition, then the prohibition is utterly nugatory and valueless, as such consideration would exist in every probable case. We consequently regard the agreement as within the constitutional prohibition, and as without validity.

*Colorado Central R.R. Co.*, 5 Colo. at 196–97. The court clearly recognized that article XI, section 2, limited the exercise of plenary legislative power even when the purpose sought to be achieved was a public purpose.

In *Lord v. City and County of Denver*, 58 Colo. 1, 143 P. 284 (1914), the City and County of Denver adopted ordinances creating a commission to participate in the construction of a trans-mountain tunnel and authorizing the issuance of bonds and the imposition of tax levies to assist in financing the project. This court held those ordinances and a contract executed pursuant thereto by the city to be prohibited, *inter alia*, by article XI, section 2, of the Colorado Constitution. Emphasizing the broad language of the section, we observed that the declarations of public necessity and convenience set forth in the ordinance "cannot prevail as against an express constitutional prohibition of the power attempted therein to be exercised." *Lord*, 58 Colo. at 26, 143 P. at 292. Citing with approval *Colorado Central R.R. Co. v. Lea*, 5 Colo. 192 (1879), we made the following observations concerning the adoption of article XI, section 2:

> Prior to the adoption of our constitution, the policy of extending public aid to private corporations, had grown to be alarming. Judge Dillon in his work on Municipal Corporations, 1 Dill. § 313 and [§] 318, points out the evil effects arising therefrom. This policy he suggests had become a mania, particularly in the west; that it had resulted in attempted repudiation upon the part of both states and municipalities, and says:

>> 'The most noted of extraordinary or extra-municipal powers conferred upon municipal and public corporations, is the authority to aid in the construction of railways by subscribing to their stock, issuing negotiable bonds as a means of paying their subscription, and taxing the inhabitants or the property within their limits to pay the indebtedness thereby incurred * * * regarded in the light of its effects, whatever may be thought of its constitutional soundness, there is little hesitation in affirming that this invention to aid the enterprise of private corporations has proved itself baneful in the last degree.'

> To prevent this evil, there began the adoption of constitutional amendments by many of the states, denying the right

of the legislature to grant such powers. Our constitution was adopted at a time when the subject was much in the public mind. An examination of the proceedings of the constitutional convention shows the introduction of several resolutions upon the subject, and repeated redrafts of these sections, with the result that sections 1 and 2 of art. XI are broader in scope, and more specific in the matter of restriction, than any similar constitutional provision considered or brought to our attention. Indeed, it would seem that language could not make plainer the intent of the framers of the constitution, to utterly prohibit the mingling of public moneys with those of private persons, either directly or indirectly, or in any manner whatsoever.

*Lord,* 58 Colo. at 15–16, 143 P. at 288 (omission in original).

The construction of article V, section 34, assumed additional complexity as the result of this court's decision in *Bedford v. White,* 106 Colo. 439, 106 P.2d 469 (1940). In that case, the state auditor refused to authorize pension payments to two retired supreme court justices on the ground, *inter alia,* that the statute providing for such payments violated article V, section 34, because it made appropriations for charitable or benevolent purposes to persons not under the absolute control of the state. A bare majority of the court concluded, over a vigorous dissent, that the constitutional proscription did not render the statute in question invalid.

The court framed the principal issue for decision as follows: "Under [article V, section 34] of the Colorado Constitution is the General Assembly *in all cases* barred from exercising the power to grant a pension to a judge who has served on the Supreme Court?" *Bedford,* 106 Colo. at 448, 106 P.2d at 473 (emphasis added). The majority initially concluded that legislative bodies possessed general plenary power to establish pension programs for government employees and distinguished pension payments from charitable or benevolent payments in that the former were in fact a form of compensation for meritorious service rendered to the public. The majority

then stated that "if it may reasonably be held that the recognition of such merit by the grant of a pension will serve a public purpose it is within the power of the General Assembly so to recognize it." 106 Colo. at 450–51, 106 P.2d at 474. The majority thus acknowledged that in some circumstances article V, section 34, would prohibit the General Assembly from exercising its plenary power to establish pension plans.

It is in this context that the majority stated that "it is universally held that if such payments are for a public purpose, the incidental fact that the recipients are private persons does not violate this constitutional provision." *Id.,* 106 Colo. at 454, 106 P.2d at 476. The majority also stated:

That pensions are not granted primarily for the benefit of the recipients thereof, but for the benefit of the state, in other words for the public good, may be admitted. If a pension has no reasonable relation to the public good it is of course a mere private grant and void. But if it serves a present public purpose it is not a mere private grant even though as an incident to the accomplishment of the public purpose the recipients thereof may be personally benefitted.

*Id.,* 106 Colo. at 454–55, 106 P.2d at 476. The dissent responded to the majority's analysis as follows:

The sole issue here is, [d]oes the [statute] violate [article V, section 34], in so far as it authorizes payment of pensions to former judges of this court who were not on the bench when it, or any similar act then applicable to them, was in force? It is conceded in the court's opinion that said sections forbid all purely private grants and that those here in question can only be upheld on the theory of public benefit. The conclusion is that the legislature must have considered the benefit public or it would not have passed the [statute]. If that theory be good all constitutional restraints on legislation are abolished. If these pensions are forbidden by the Constitution they are void. If not so forbidden they are clearly within the discretion of the legislation.

My position is that there must be some reasonable theory of public benefits. If there be such the soundness of it rests with the legislature. If, as here, there is no such theory, the grant is purely private and the constitutional inhibition stands....

*Id.*, 106 Colo. at 460, 106 P.2d at 478.

These passages of *Bedford* launched the "public purpose" doctrine. Both the majority and the dissent distinguished the "public purpose" which, if present, would be sufficient to sustain legislation otherwise arguably prohibited by article V, section 34, from the general public benefit purpose necessary for the exercise of plenary legislative power under article V, section 1. The majority found such a present public purpose in the public benefits derived from appropriately compensating government employees and thereby encouraging meritorious service by such employees. The dissent disagreed that such benefits were in fact public benefits.

This court has had few occasions to consider the public purpose doctrine in article V, section 34, challenges to legislation since *Bedford*.[5] In *In re Interrogatories H.B. No. 1247*, 193 Colo. 298, 566 P.2d 350 (1977), we responded to a request by the Colorado Senate that we consider whether a bill appropriating funds to the Colorado Housing Finance Authority violated, *inter alia*, both article XI, section 2, and article V, section 34, of the Colorado Constitution. We held that article XI, section 2, was inapplicable because the recipient of the funds was a political subdivision of the state, *id.*, 193 Colo. at 307, 566 P.2d at 356, and also because "the public purpose doctrine ... applies." *Id.* In that case we also determined that article XI, section 1, of the Colorado Constitution was inapplicable "because the appropriation furthers a valid public purpose," 193 Colo. at 306, 566 P.2d at 356, and described this public purpose as follows:

The legislative declaration ... emphasizes that it was compelled to establish the authority to meet critical needs in the areas of low and middle-income housing and to conserve scarce energy resources being consumed in inadequately designed and constructed housing.

*Id.*, 193 Colo. at 307, 566 P.2d at 356. The public purpose thus recognized as sufficient to satisfy the article XI challenges to the legislation was immediate, clear and distinct from the general public benefit purpose required for the exercise of plenary legislative authority.

In addressing the article V, section 34, challenge in *In re Interrogatories H.B. No. 1247*, we first held that the bill did not violate that section because the recipient of the appropriations was under the absolute control of the state. *Id.*, 193 Colo. at 307, 566 P.2d at 357. We then observed that the bill did not violate article V, section 34, because the appropriation was "designed to promote the public purpose of providing housing for low- and moderate-income persons—a valid public purpose." *In re Interrogatories H.B. No. 1247*, 193 Colo. at 308, 566 P.2d at 357. This public purpose was clearly articulated and is distinct from the general public benefit purpose validating plenary legislative conduct.

We also addressed the public purpose doctrine in *Americans United v. State*, 648 P.2d 1072 (1982), wherein an organization asserted, *inter alia*, that the Colorado Student Incentive Grant Program, § 23–3.5–101 to –106, 9 C.R.S. (1981 Supp.), facially violated article V, section 34. We rejected this claim on the basis of the public purpose doctrine, citing *Bedford v. White*, 106 Colo. 439, 106 P.2d 469 (1940). *Id.*, 648 P.2d at 1085. However, we carefully distinguished the nature of the public purpose necessary to avoid the proscriptions of article V, section 34, as follows:

We do not mean to imply that because a public purpose may be presumed from

---

5. In *Lyman v. Town of Bow Mar*, 188 Colo. 216, 533 P.2d 1129 (1975), residents of a municipality asserted that a local ordinance establishing an improvement district to buy overhead lines of two utilities violated, *inter alia*, article XI, section 2, and article V, section 34. We held

that the ordinance did not authorize a grant or a donation prohibited by article XI, section 2, and that article V, section 34, did not apply to municipalities. *Lyman*, 188 Colo. at 227, 533 P.2d at 1134–36. The public purpose doctrine was not considered.

the passage of a legislative enactment, any statutory appropriation would pass muster under Article V, Section 34. On the contrary, the legislation must evince a discrete and particularized public purpose which, when measured against the proscription of Article V, Section 34, preponderates over any individual interests incidentally served by the statutory program....

*Id.* at 1086. The discrete and particularized purpose referred to is distinct from the broad public purpose requirement essential to the valid exercise of plenary legislative power.

In sum, our cases have established a narrow exception to the broad language of article V, section 34, prohibiting the exercise of plenary legislative power by the General Assembly. The General Assembly's authority under article V, section 1, to act in furtherance of the public health, safety, welfare and morals is admittedly broad in scope. However, section 34 of that same article V specifically prohibits the exercise of such plenary legislative power to make appropriations for industrial purposes to any private corporation unless the power is exercised in furtherance of a distinct, immediate and clearly defined public purpose. The prohibition was designed to ensure that public funds of the state would not be used to further private enterprise of any type. The public purpose exception cannot be equated with the broad public benefit standard by which all valid exercise of plenary legislative power is measured.

In this case, there is no such distinction. The stated purpose of H.B. 1005 is to enhance Colorado's economic climate by encouraging the development of many well-paying jobs in the state. The majority states that the General Assembly has identified two discrete and particularized public purposes: developing new and expanding existing businesses and benefiting the state aviation system. Op. at 884. Such goals are simply examples of the broad purposes of furthering the health, safety, welfare and morals of the state validating the exercise of plenary legislative power. Every legislative effort to encourage economic growth in fields such as aviation, agriculture, banking or manufacturing may be deemed an effort to benefit the public—precisely the broad public purpose the General Assembly serves whenever it chooses to act. The prohibitions on the exercise of such admittedly broad authority contained in article V, section 34, may not be circumvented by mere linguistic legerdemain.

Assuming the purpose of creating additional well-paying jobs in Colorado may be deemed a public purpose sufficiently distinct from the general public benefit purpose required for the valid exercise of article V, section 1, legislative power to satisfy the public purpose doctrine exception to the prohibition of article V, section 34, I concur with the conclusion of Justice Quinn that the industrial purpose of H.B. 1005 clearly preponderates over such public purpose. *Dissent of Quinn, J.,* at p. 903.

Justice QUINN dissenting:

If a well-intentioned motive to foster economic development in the state were the controlling constitutional standard for evaluating House Bills 1005 and 1009, I would have little hesitation in concluding that both bills pass constitutional muster. The well-intentioned motive of lawmakers, however, is not a surrogate for objective constitutional norms applicable to legislative enactments. While there is a presumption of constitutionality attaching to a statute, I am satisfied that the statutory scheme under consideration violates the constitutional proscription against special legislation in Article V, Section 25 of the Colorado Constitution. Furthermore, because House Bills 1005 and 1009 establish economic incentives that are peculiarly tailored to grant a special privilege to United Airlines, I am unable to conclude that these bills satisfy the public-purpose doctrine which is applicable not only to governmental grants to a corporation, Colo. Const. art. XI, § 2, but also to a legislative appropriation to a corporation for industrial purposes, Colo. Const. art. V, § 34. I accordingly dissent from the court's opinion and would declare House Bills 1005 and 1009 unconstitutional.

### I.

A general law is one that operates uniformly "upon all in like situation." *People ex rel. Johnson v. Earl*, 42 Colo. 238, 264, 94 P. 294, 302 (1908); *accord, Driverless Car Co. v. Armstrong*, 91 Colo. 334, 337, 14 P.2d 1098, 1099 (1932). A special law, in contrast, is one that is enacted for an individual case and singles out a particular person, entity, or selective group of persons or entities for special treatment to the exclusion of other persons or entities within the same class. *See, e.g., Morgan County Junior College Dist. v. Jolly*, 168 Colo. 466, 470, 452 P.2d 34, 36 (1969); *In re Constitutionality of Senate Bill No. 293*, 21 Colo. 38, 40–41, 39 P. 522, 523 (1895); *see generally* 2 Sutherland, *Statutory Construction* § 40.04 (4th ed. 1986). Article V, section 25 of the Colorado Constitution prohibits the General Assembly from passing a special law in twenty-three enumerated cases including, as critical here, a special law "granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever." This constitutional provision also states that in all other cases "where a general law can be made applicable no special law shall be enacted."[1] The purpose of article V, section 25 is to protect against legislative enactments that either benefit or disadvantage a particular person, entity, or artificially created group. *Denver v. Bach*, 26 Colo. 530, 533, 58 P. 1089, 1090 (1899).

If, of course, the subject matter of proposed legislation does not fall within the prohibited list of enumerated cases, then the General Assembly may enact a special law to address the particular problem as long as a general law cannot be made applicable to the case. *E.g., Morgan County Junior College*, 168 Colo. at 470, 452 P.2d at 36. Although the decision whether a general law can or cannot achieve the purpose sought to be accomplished is for the legislature to make, it remains the constitutional responsibility of this court to thwart any legislative effort, however bona fide, to evade the constitutional prohibition against special legislation. *E.g., Coulter v. Board of County Commissioners*, 9 Colo. 258, 260–61, 11 P. 199, 200–01 (1886). The fact that the inclusion of a legislative grant of special privilege to a corporation is within the prohibited list of twenty-three enumerated cases means simply that any law granting such privilege must be by general law.

Neither the Governor nor the General Assembly disputes the fact that the creation of a business incentive fund and the allocation of aviation fuel tax revenues to that fund are matters which can be addressed by general laws. Furthermore, the General Assembly has made no determination that general laws could not adequately address these matters, nor did it enact House Bills 1005 and 1009 as special laws. The critical issue before us, therefore, is whether House Bills 1005 and 1009 are special laws. If they are, then it neces-

---

**1.** Article V, section 25 of the Colorado Constitution states in its entirety:

> **Section 25. Special legislation prohibited.** The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say; for granting divorces; laying out, opening, altering or working roads or highways; vacating roads, town plats, streets, alleys and public grounds; locating or changing county seats; regulating county or township affairs; regulating the practice in courts of justice; regulating the jurisdiction and duties of justices of the peace, police magistrates and constables; changing the rules of evidence in any trial or inquiry; providing for changes of venue in civil or criminal cases; declaring any person of age; for limitation of civil actions or giving effect to informal or invalid deeds; summoning or im-

> paneling grand or petit juries; providing for the management of common schools; regulating the rate of interest on money; the opening or conducting of any election, or designating the place of voting; the sale or mortgage of real estate belonging to minors or others under disability; the protection of game or fish; chartering or licensing ferries or toll bridges; remitting fines, penalties or forfeitures; creating, increasing or decreasing fees, percentage or allowances of public officers; changing the law of descent; granting to any corporation, association or individual the right to lay down railroad tracks; granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever. In all other cases, where a general law can be made applicable no special law shall be enacted.

sarily follows that they violate the constitutional proscription against the legislative enactment of a special law which grants a special privilege to a corporation.

The determination of the status of a bill as a general or special law turns ultimately on the purpose of the legislative enactment. There is no more revealing source for determining legislative purpose than the official remarks of the Governor in convening the extraordinary session of the General Assembly and the comments of legislators during committee hearings on the bills. In resolving the question before us, we should not limit ourselves to the statutory language employed by the General Assembly. We recognized as much in *In re Senate Bill No. 95,* 146 Colo. 233, 361 P.2d 350 (1961), where we invalidated a statute that authorized a city or city and county surrounding a town of less than 640 acres to annex the surrounded town. While the bill in that case was written in general terms, this court emphasized that as judges we may not close our eyes to facts which "we conclusively know to be true" and which were known to every member of the legislature and to every other interested person when the bill in question was enacted. 146 Colo. at 238, 361 P.2d at 353. In striking down the bill as special legislation uniquely tailored to provide for the annexation of Glendale by the City and County of Denver, we stated:

> Having twice attempted, without success, to annex Glendale under provision of the existing law, those advocating annexation (no doubt with the best of motives) seek by the proposal in question to accomplish by compulsion, powered by this special act, that which they have been unable to accomplish by application of the general law upon the subject.
>
> This is exactly what the constitution forbids in plain language. Senate Bill No. 95 was unquestionably conceived, cut, tailored and amended to accomplish a particular purpose with reference to a particular area, to-wit, Glendale. Once having accomplished that particular purpose the act would die before it could possibly accomplish a like purpose in any another place. The thin veneer of language used to "get around" the constitutional prohibition, and to give the measure a mask of general application, falls from the face of the bill when considered in the light of common knowledge of which we may take judicial notice.

146 Colo. at 239, 361 P.2d at 354. In answering the Governor's interrogatory, therefore, we should properly take notice, at a minimum, of those matters known to and expressed by the Governor in calling the extraordinary session for passage of these bills and those matters known to and expressed by the members of the General Assembly in enacting the legislation in question.

II.

An examination of the legislative record surrounding House Bills 1005 and 1009 leads me to conclude that these bills were conceived by the Governor as an economic incentive uniquely tailored to obtain a commitment from United Airlines to operate a maintenance facility in the Denver area and were enacted by the General Assembly to achieve that purpose and no other. The statutory scheme under consideration was enacted by the General Assembly at a special session convened by the Governor pursuant to article IV, section 9 of the Colorado Constitution. In his proclamation, the Governor described the purpose of the session as follows:

> Concerning incentives for employers who establish or commence construction of a new business facility on or before July 1, 1994 in an enterprise zone in a Metropolitan Statistical Area that will employ at least 3,000 new employees at an average annual salary of at least $45,000 or in an enterprise zone in a non-Metropolitan Statistical Area that will employ at least 1,500 new employees at an average annual salary of at least $45,000, and the financing of such incentives.
>
> Concerning the allocation of revenues attributable to taxes imposed on aviation fuel, and, in connection therewith, providing for the use of such moneys, and making an appropriation in connection therewith.

The Governor's proclamation, although in general terms, was more precisely informed by his address to the General Assembly. In that address the Governor left no doubt that the purpose of the special session was to respond to the proposal of United Airlines to operate a maintenance facility in the Denver area in return for sufficient economic incentives from the state. The Governor specifically told the General Assembly that "[w]hen we look at this particular issue on the table, namely the MOC [maintenance] facility and the United proposal, it has a uniqueness because it relates to a very critical piece of infrastructure in this state, and that's a transportation hub." (Tape recording of Governor's Message to Joint Session of General Assembly, First Extraordinary Session, June 4, 1991). The Governor described the United Airlines offer as "a thirty year deal" and stated that "[i]n reference to our commitment of resources to this job opportunity and this airport, we are looking at a present value of somewhere around 150 to 200 million." *Id.* He then acknowledged that the United Airlines offer "was worth our paying the price," stating:

> I was very pragmatic about it. It is a piece of infrastructure.... Now therefore we have a question on our table. [I]s it worth it to us to spend that kind of money to do this[?] Now let me quickly add, I don't like to do that. I was not happy when that price came to me and I said that publicly. But you've got to look at where we are in the world, we are in a world in which airlines have options, and they surely do and they are playing these options with a tough hand. I don't like it, but it's the world. And it is probably what anyone would do who is running that kind of an airline. They are going to say ... we're going to go where we get the best value and that's what we're in. Therefore, as a person who has been representing you in economic development for five years, I looked at this deal, I looked at it very closely, and I said yes, it's worth it.

*Id.*

The Governor then urged the General Assembly to consider the following statutory scheme:

> Take that revenue stream from the fuel tax, put it in a fund, dedicate that fund to do two things, one, to finance the incentive that we need to finance with United to make that airport that much better in terms of its traffic and its business and its job creation, and at the same time take care of the obligation to rural Colorado, but with two exceptions or additions. For rural Colorado you may need to add more money if you find that you need all of the aviation fuel tax in order to constitutionally cover yourself with United....
>
> \* \* \* \* \* \*
>
> This is a deal that ought to be made, this is a deal that ought to work.... I'd love to have you come and pay me the kind of incentive that we're talking about paying United, I'd love it. But you shouldn't do it because I don't need it. I was here anyway. Or I would have come here anyway.... But if you're in a marketplace where everybody wants that maintenance facility you may have to and you do have to bring some incentives to the table. So I would like to say to you that I think that we can together work out these distinctions, I think that we can together find a way that this deal makes sense and we ought to be entrepreneurial about it.

*Id.*

Similar comments were echoed by members of the General Assembly. When House Bill 1005 was considered by the Senate Finance Committee, Senator Owens expressed his appreciation for the opportunity to bring "United Airlines to Colorado." (Tape recording of Senate Finance Committee Hearings on House Bill 1005, First Extraordinary Session, June 7, 1991). Senator Mendez during the same hearing expressed concern that there was only one company, United Airlines, "that really is seeking" the incentive package. *Id.* Senator Trujillo was opposed to House Bill 1005 precisely because, in his words, "the level of payment, the level of employees, the

sunset date," relate only to the United Airlines offer to operate a maintenance facility in the Denver area. *Id.* In addressing these concerns, Senator Strickland, the President of the Senate, left no doubt about the special character of the proposed legislative package. Speaking to the concern about whether or not House Bill 1005 was designed for United Airlines, he stated, "There has never been anybody that I know of that has ever denied that." *Id.* Senator Fenlon, the Chair of the Senate Finance Committee, corroborated these remarks by stating:

> [Y]ou know, I know, the media knows, everybody in this room knows that we are here to take advantage of United Airlines and their effort to come here, we want that benefit here. We're trying to do it in a way that meets constitutional muster, so the bill has been drafted to do just that.[2]

### III.

Although the statutory scheme is written in general terms, the operative effect of the legislation is to provide United Airlines, and only United Airlines, with a $115,000,-000 incentive for locating its airline maintenance facility in the Denver metropolitan area. This is obvious from a review of the structure of the legislation.

The declared purposes of House Bill 1005 are to develop and expand employment opportunities in the state and to stabilize the state's economic base. § 24–46.5–101. The bill ostensibly seeks to accomplish those objectives by creating the Colorado Business Incentive Fund, which consists of moneys generated by sales and use taxes on Denver airport aviation fuel, § 24–46.5–102, which moneys would otherwise have been transferred from the aviation fund to the City and County of Denver pursuant to section 43–10–110. The aggregate amount of monies available to any one business entity cannot exceed $115,000,000. § 24–46.5–103(5).

House Bill 1005 authorizes the State of Colorado to enter into an intergovernmental agreement with a local government, such as the City and County of Denver, or the Colorado Housing and Finance Authority, or both, pursuant to which monies from the "Colorado Business Incentive Fund shall be expended for economic development purposes." § 24–46.5–103(1)(a). Any intergovernmental agreement must be conditioned upon an agreement between the local government and the business entity establishing a new business facility that the business entity will operate the new facility for not less than thirty years and will employ not less than 3,000 employees by July 1 of the tenth year following the effective date of the agreement at an average annual salary for all employees of at least $45,000. § 24–46.5–103(2)(a) & (b). The bill also requires that "[t]he terms of the intergovernmental agreement shall provide that the entity shall employ no less than a total of 2,000 employees at ancillary facilities within Colorado to the facility by July 1 of the tenth year following the effective date of such agreement for the operation of said facility" at an annual average salary for all employees of at least $22,500. § 24–46.5–103(2)(c). Under the statutory scheme, the Colorado Business Incentive Fund serves as the conduit for dispersing the $115,000,000 to the business entity.

That the purpose of House Bill 1005 is to provide a $115,000,000 economic incentive to United Airlines for its decision to locate a maintenance facility in the Denver area is obvious from House Bill 1009. Section 43–10–110(2) provides that if an intergovernmental agreement is entered into pursuant to the provisions of section 24–46.5–103(1), which relates to the intergovernmental agreement for expenditure of the moneys from the Colorado Business Incentive Fund, then the portion of the sales and use tax revenues that would otherwise be transferred to the governmental entity "op-

---

**2.** The extraordinary session of the General Assembly generated such a media blitz that it would be disingenuous to say that a Colorado resident with a modicum of curiosity about matters of public interest would not know that the sole purpose of the session was to enact legislation designed to provide United Airlines with sufficient economic benefits to induce it to locate its maintenance facility in the Denver metropolitan area.

erating the largest airport in the state [*i.e.*, the City and County of Denver] shall be transferred to the Colorado Business Incentive Fund created in section 24–46.5–102, C.R.S." This section further provides that "[i]f such an intergovernmental agreement is entered into, moneys shall be transferred by the state treasurer, beginning July 1, 1991, for the length of the intergovernmental agreement."

Given the fact that the Governor informed the General Assembly that United Airlines' offer to operate a maintenance facility would require a "thirty year deal" as well as state incentives amounting to "around 150 to 200 million" dollars, there remains no doubt that the legislative decision to cap the Colorado Business Incentive Fund at $115,000,000 for any one entity was intended as a legislative response to the "United deal." Indeed, neither the Governor nor the General Assembly dispute the fact that the so-called "United deal" would consume all the money available under the Colorado Business Incentive Fund. I thus view the Governor's remarks to the General Assembly and the several comments made by legislators during committee hearings on House Bill 1005 as unimpeachable proof that the statutory conditions relating to the Colorado Business Incentive Fund—the $115,000,000 incentive package, the duration of the intergovernmental agreement, the number of employees employed at the maintenance facility, and the salary of those employees—were fashioned for no purpose other than to provide United Airlines with a sufficient economic incentive to locate its airline maintenance facility in the Denver metropolitan area.

In upholding the constitutionality of the statutory scheme, the majority acknowledges that the constitutional prohibition against special legislation is "more than a redundant equal protection clause," and then reasons that "if an act is challenged as special legislation, and an enumerated prohibition is implicated, the threshold question is whether the classification adopted by the legislature is a real or potential class, or whether it is logically and factually limited to a class of one and thus

illusory." Maj. op. at 886. In my view, a statutory scheme may logically and factually limit a class to one person or entity and not necessarily be illusory so long as the class remains open to admission of other members. *See Darrow v. People ex rel. Norris*, 8 Colo. 417, 418–19, 8 P. 661, 662 (1885). Having said as much, I cannot agree with the majority's conclusion that the legislation under consideration actually creates genuine and reasonable classifications between persons or business entities. Maj. op. at 887–888.

The classifications identified by the majority are lacking in substance. The first classification to which the majority refers is between "aviation-related entities and all other entities." Maj. op. at 887. The Colorado Business Incentive Fund created by House Bill 1005, however, is limited to moneys transferred to the fund from revenues in the aviation fund. Because moneys in the aviation fund must be used exclusively for aviation purposes, and because no other monies are identified for funding non-aviation business incentives, the purported classification between aviation-related entities and all other entities has no foundation in the historical circumstances out of which the statutory scheme emerged. As evidenced by the statements of various legislators during committee hearings, House Bill 1005 has been tailored to fit the pattern designed by the Governor in his address to the General Assembly. Pursuant to that design, all moneys available from the Colorado Business Incentive Fund are intended for United Airlines only. So considered, House Bill 1005 must be viewed as nothing less than special legislation.

The majority next identifies a classification between "entities establishing new businesses in Colorado that will operate a facility for at least thirty years and employ at least 3,000 people paid an average of $45,000 per year, and all other businesses." Maj. op. at 887. The two components of this classification, however, as manifested in the remarks of the Governor to the General Assembly, the legislative history of House Bill 1005, and the design and

operation of the statutory scheme are, on the one hand, United Airlines, the only business entity to which the $115,000,000 incentive package is directed, and, on the other hand, all other businesses. Since no incentive funding is identified or available for the other businesses, the suggested classification is an inadequate foundation for supporting the conclusion that House Bill 1005 satisfies the requirements of a general law.

The majority's effort to salvage House Bill 1005 on the basis of a purported classification between "the establishment of new facilities and expansion of existing facilities" is similarly misplaced. Maj. op. at 887. Subsection (2)(b) of section 24–46.5–103 requires the terms of the intergovernmental agreement to provide that the business entity operating the new business facility shall employ 3,000 persons at an average annual salary of at least $45,000, while subsection (2)(c) of this section states that the terms of the intergovernmental agreement require the entity to employ no less than a total of 2,000 employees "at ancillary facilities within Colorado to the facility" at an average annual salary of at least $25,000. It is not axiomatic from this statutory terminology that subsection (2)(c) contemplates a business entity other than United Airlines operating a facility "ancillary" to the new business facility. The ordinary meaning of the term "ancillary" is subordinate or auxiliary to something—in this case the "something" is the new business facility. *Webster's Third New International Dictionary* 80 (1986). *See Black's Law Dictionary* 78 (5th ed. 1979). The language of subsection (2)(c) is aimed at "the [business] entity" described in subsection (2)(b) and at a facility "ancillary" to that business entity's new business facility. If subsection (2)(b) is directed to United Airlines—a fact that the General Assembly does not dispute—the import of subsection (2)(c) would seem to be that the General Assembly also intended United Airlines to operate the ancillary facility.

The General Assembly, however, reads subsection (2)(c) differently and, after conceding in its brief that subsection (2)(b) is intended to benefit United Airlines for its decision to locate and operate the new business facility in the Denver area, argues that in order to placate "potential criticisms of legislation which appeared to benefit only one airline," it defined "the class more broadly" to include an "aviation-related economic development which could benefit other business firms." I find this argument devoid of merit. Even if the statutory text of subsection (2)(c) might be stretched to include a business entity other than United Airlines, the absence of any identifiable funds for such an enterprise renders the purported classification gossamer-like at best and inadequate to the task of dispelling the "special law" character of the overreaching statutory scheme, the paramount purpose of which is to award all Colorado Business Incentive Fund moneys to United Airlines.

Finally, the majority extracts from House Bill 1005 a classification between a business entity establishing a new business facility pursuant to subsection (1) of section 24–46.5–103 and some other non-aviation business entity establishing a new business facility pursuant to subsection (3) of the statute. Maj. op. at 887. I acknowledge that section 24–46.5–103(3) purports to authorize local governments to enter into intergovernmental agreements with non-aviation business entities. Article X, section 18 of the Colorado Constitution, however, requires that revenues from aviation fuel taxes "be used exclusively for aviation purposes," and thus constitutes an insurmountable barrier to using aviation fuel tax revenues as an incentive to a non-aviation business entity. In light of the patent lack of any statutory funding source for an intergovernmental agreement between a local government and a non-aviation business entity, the purported classification between an aviation-related business entity and a non-aviation business entity represents an ineffective legislative effort to provide an ostensible semblance of generality to a bill that is fundamentally "special" in conception, design, and effect.

Viewed from the perspective of historical fact, the use of generic language in House Bills 1005 and 1009 represents a legislative

effort to sidestep the constitutional prohibition against special legislation. As this court stated in *In re Senate Bill No. 95,* "[t]he thin veneer of language used to 'get around' the constitutional prohibition, and to give the measure a mask of general application, falls from the face of the bill when considered in the light of common knowledge of which we may take judicial notice." 146 Colo. at 239, 361 P.2d at 354. I view the majority's analysis of House Bills 1005 and 1009 as a wolf in sheep's clothing. The majority's "classification" rationale is nothing but a parade of supposedly objective criteria that mask what in reality is a legislative grant of special privilege to one corporation, United Airlines. The result of the court's holding, in my view, is to allow the clever use of generic statutory terminology to effectively dispatch the constitutional prohibition against special legislation in Article V, section 25 of the Colorado Constitution.

### IV.

Because I am of the view that House Bills 1005 and 1009 violate the constitutional prohibition against special legislation granting a corporation a special privilege, I am also convinced that both bills fail to satisfy the public-purpose doctrine and thus violate the constitutional prohibition against state aid to a corporation, Colo. Const. Art. XI, sec. 2, and the constitutional proscription against making an appropriation for industrial purposes to a corporation, Colo. Const. art. V, sec. 34. The public-purpose doctrine is not the equivalent of the rational-basis standard of review applicable to due process analysis, for if the existence of any legitimate governmental interest can effectively insulate a statute from the Anti–Donation and Private Appropriation Clauses of the Colorado Constitution, then the constitutional proscription against special legislation would be utterly "nugatory and valueless." *Colorado Central R.R. v. Lea,* 5 Colo. 192, 196 (1879).

In *Americans United for Separation of Church and State Fund, Inc. v. State of Colorado,* 648 P.2d 1072 (Colo.1982), we upheld the Colorado Student Incentive Grant Program against a constitutional challenge that the program constituted an appropriation of state funds to an educational institution not under the absolute control of the state for educational purposes in violation of Article V, Section 34, of the Colorado Constitution. In concluding that the statutory incentive program satisfied a public purpose in conformity with the Colorado Constitution, we added this caveat:

> We do not mean to imply that because a public purpose may be presumed from the passage of a legislative enactment, any statutory appropriation would pass muster under Article V, Section 34. On the contrary, the legislation must evince a discrete and particularized public purpose which, when measured against the proscription of Article V, Section 34, preponderates over any individual interests incidentally served by the statutory program.

648 P.2d at 1086 (footnote omitted).

I fully endorse the proposition that the development and expansion of employment opportunities in the state and the stabilization of the state's economic base are legitimate governmental objectives. It is conjectural at best, however, whether most, some, or even any of the 3,000 jobs at the "new business facility" or the 2,000 jobs at the "ancillary facility" will be filled by Colorado residents. The resulting uncertainty of employment prospects for Colorado residents militates against the legislative declaration that "the public purpose served by the passage of this article outweighs all of the individual interests." § 24–46.5–101. Added to that fact are the Governor's remarks to the General Assembly, the available legislative history of House Bill 1005, and the design and operative effect of the statutory scheme, all of which demonstrate quite conclusively that the paramount and clearly preponderating purpose of the legislation before us is to provide sufficient economic incentives to satisfy the individual interests of United Airlines.

I therefore would hold House Bills 1005 and 1009 violative of the constitutional proscription against special legislation, Colo.

Const. art. V, § 25, the constitutional prohibition against a state grant in aid of a corporation, Colo. Const. art. XI, § 2, and the constitutional proscription against an appropriation to a corporation for industrial purposes, Colo. Const. art. V, § 34. I accordingly dissent.

ROVIRA, C.J., joins in this dissent.